# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MIDDESK, INC., | ) Case No. 1:25-cv-02677-PKC |
| Plaintiff, | ) |
| v. | ) |
| OSIRIS RATINGS, INC. d/b/a BASELAYER, and JONATHAN AWAD, and JOSH LEVILOFF, | ) |
| Defendants. | ) |

## DEFENDANTS OSIRIS RATINGS, INC.'S AND JONATHAN AWAD'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S ORDER TO SHOW CAUSE FOR EXPEDITED DISCOVERY

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................................ 1

II.  STATEMENT OF FACTS ............................................................................................. 4

III.  ARGUMENT ................................................................................................................. 7

    1.  Applicable Legal Standards. ................................................................................. 7

    2.  Plaintiff Has Not Shown Good Cause For The Requested Discovery ................... 8

    3.  Plaintiff Has Not Met The *Notaro* Factors. ...................................................... 12

        a)  Plaintiff Has Not Shown It Will Be Irreparably Injured Absent The Requested Relief. ...................................................................................... 13

        b)  Plaintiff's Showing of Likely Success on the Merits is Limited And Does Not Justify Expedited Discovery Against Defendants. ........... 15

        c)  Plaintiff Has Not Shown a Connection Between The Requested Discovery And The Alleged Injury ....................................................... 16

        d)  Plaintiff's Alleged Injury Does Not Outweigh The Burden, Inconvenience, And Harm to Defendants From The Requested Discovery. ................................................................................................ 17

    4.  The Requested Discovery Is Excessive, Overly Burdensome, And Not Supported By The Alleged Evidence Provided By Plaintiff. ............................... 20

IV.  THE REQUESTED DISCOVERY IS INEQUITABLE. ............................................. 22

V.  CONCLUSION ............................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Ayyash v. Bank Al-Madina*,
  233 F.R.D. 325 (S.D.N.Y. 2005) ...................................................................................8, 12

*Ceglia v. Zuckerberg*,
  No. 10-CV-00569A F,
  2013 WL 1208558 (W.D.N.Y. Mar. 26, 2013),
  *report and recommendation adopted*, No. 10-CV-00569-A,
  2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014),
  *aff'd*, 600 F. App'x 34 (2d Cir. 2015) ...............................................................................21

*Citibank, N.A. v. Mitchell*,
  No. 24-CV-08224-CRB,
  2024 WL 4906076 (N.D. Cal. Nov. 26, 2024) ..................................................................20

*Comet Technologies United States of America Inc. v. Beuerman*,
  No. 18-CV-01441-LHK,
  2018 WL 1990226 (N.D. Cal. Mar. 15, 2018)..............................................................20, 21

*Estee Lauder Companies v. Batra*,
  430 F. Supp. 2d 158 (S.D.N.Y. 2006)................................................................................15

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009).........................................................................................13, 14

*FMC Corp. v. Taiwan Giant Industrial Co., Ltd.*,
  730 F.2d 61 (2d Cir. 1984).................................................................................................13

*GeigTech E. Bay LLC v. Lutron Electronics Co., Inc.*,
  No. 18 CIV. 5290 (CM),
  2018 WL 4360792 (S.D.N.Y. Sept. 5, 2018).......................................................................8

*IKON Office Solutions, Inc. v. Leichtnam*,
  No. 02-721,
  2003 WL 251954 (W.D.N.Y. Jan. 3, 2003) .......................................................................17

*LC Trenching Co., LLC v. Newton*,
  No. 6:11-CV-0515,
  2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011)..................................................................21

*Levy v. Young Adult Inst., Inc.*,
  No. 13-CV-2861 (JPO),
  2015 WL 170442 (S.D.N.Y. Jan. 13, 2015) .........................................................................7

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)................................................................................................23

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) .................................................................7, 12, 13, 19

*Pyro Spectaculars N., Inc. v. Souza*,
    No. CIV S-12-0299 GGH,
    2012 WL 13220023 (E.D. Cal. Feb. 8, 2012),
    *amended in part*, No. CIV S-12-0299 GGH,
    2012 WL 13220022 (E.D. Cal. Feb. 23, 2012)..............................................................21

*Sapient Corp. v. Singh*,
    149 F. Supp. 2d 55 (S.D.N.Y. 2001)..............................................................................17

*Shaughnessy v. Scotiabank*,
    No. 22 CV 10870 (LAP),
    2024 WL 1350083 (S.D.N.Y. Mar. 29, 2024) .................................................................7

*Suber v. VVP Servs.*,
    No. 20-8177,
    2021 WL 1101235 (S.D.N.Y. March 23, 2021) ............................................................12

*TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*,
    No. 24-CV-6150 (JMF),
    2024 WL 4627452 (S.D.N.Y. Oct. 30, 2024),
    *reconsideration denied sub nom. TushBaby, Inc. v.*
    *Jinjang Kangbersi Trade Co, Ltd*, No. 24-CV-6150 (JMF),
    2024 WL 4769686 (S.D.N.Y. Nov. 13, 2024)..................................................................7

## I.    INTRODUCTION

This entire case arises from a single text message that Baselayer's CEO, Defendant Jonathan Awad, sent to Defendant Josh Leviloff in February 2025 while Mr. Leviloff still worked at Plaintiff Middesk, Inc. asking him about two pieces of information with no real value to Baselayer and which Awad did not believe were confidential. From there, Plaintiff has dredged up years old activity by Awad which supposedly proves that Awad had a many-year scheme to steal Middesk's trade secrets and start a rival business. This rank speculation is illogical and contradicted by the evidence. Moreover, Plaintiff has failed to show that Defendants' actions create any urgency whatsoever that justifies the need for expedited discovery. The parties have agreed on a Temporary Restraining Order preventing Defendants from using or disclosing Plaintiff's confidential information and Plaintiff will be obtaining discovery from Leviloff directly. Middesk's discovery requests, including unrestricted intrusion into Defendants' personal and business accounts and electronic devices, are far too broad and unnecessary to address any alleged ongoing injury.

Awad acknowledges downloading files and sending himself emails relating to his personal deals for Middesk in 2021 and 2022 that he inadvertently retained when he left Middesk in January 2023 (the "Files"). These Files were not, and could not have been, used to start Baselayer or aid it in any way.

*First*, the Files remained virtually *untouched* in all the years after they were sent or downloaded. Awad has reviewed his Drive and confirmed that, to the best of his recollection, he did not open them – with a single *possible* exception – or share them with anyone at Baselayer.

*Second*, the information was not of any use to Baselayer since the company developed an entirely distinct product from Middesk. Awad began planning Baselayer approximately one month after his departure from Middesk. Awad and his co-founder created a new tool for financial institutions to obtain information about their customers to detect potential fraud risks. Middesk *does not* offer a fraud product, did *not* have a similar fraud product while Awad worked there, and

Awad had no indication that Middesk planned to develop such a product at any point while Awad worked there. In fact, Baselayer and Middesk started a partnership in July 2023 through which Middesk gave Baselayer access to Middesk's data sources for Baselayer to use in its own product. Middesk abruptly ended the relationship in November 2023 when it learned more about what Baselayer was doing and decided it wanted to develop a similar offering.

Plaintiff's story falls apart here. Awad could not have taken any Middesk information to start a competitive business because he was not planning to start Baselayer when he left and Middesk had not even decided to offer a competing product until months later when it decided to copy *Baselayer*. Middesk does not, and cannot, explain how its information could have helped Awad launch a wholly new product. Middesk similarly cannot explain why it needs expedited discovery in April *2025* when it has known since as late as November *2023* that Awad had started Baselayer and was offering a fraud detection product. The information is undoubtedly stale by this point. Belying the lack of any urgency or importance, Middesk made no effort whatsoever to address this issue until it filed this lawsuit on March 31, 2025. Middesk's silence in the many intervening months speaks volumes.

Defendants are not part of an ongoing scheme to steal Middesk trade secrets. Awad asked Leviloff for confirmation about whether Middesk still uses specific vendors for certain of its data sources. This is not valuable information and would not help Baselayer. Middesk has not shown how such information could possibly constitute a trade secret. Awad did not tell Leviloff to download any Middesk files or bring them to Baselayer. Awad did not instruct Leviloff to lie to Middesk or use false pretenses to gain any information. There is no evidence at all suggesting that Baselayer is using, or will use, any confidential information allegedly taken from Middesk by Leviloff. Leviloff's employment also does not pose any sort of ongoing threat to the protection of Middesk's alleged trade secrets – Baselayer put Leviloff on a paid leave almost immediately after being put on notice of his conduct in early March 2025 and has not restarted his active employment since then.

The requested discovery is excessive, intrusive, and untethered to any ongoing injury that Middesk could suffer. Middesk wants broad access to multiple of Awad's personal and business devices and accounts, as well as the accounts of an untold number of Baselayer employees. Middesk makes no allowance for the legitimate privacy interests of Awad and other Baselayer employees, or the fact that Baselayer is now an admitted competitor and has its own sensitive and proprietary information that it would legitimately want to keep out of Middesk's hands. There is nothing in Middesk's proposed relief that would cabin the requested discovery to what is necessary to recover its files. Middesk also admittedly wants to obtain broad-based discovery from Defendants to support a preliminary injunction but has not explained what specifically Middesk could be seeking from a preliminary injunction that would necessitate the broad discovery requested. Defendants have agreed to a temporary restraining order to not use or disclose Middesk confidential information and are willing to return all files to Middesk. It is not clear why this would be insufficient. Middesk's request for discovery is also deficient because it does not make any allowance for Defendants' own discovery. One-sided discovery is not appropriate. Defendants should have a full and fair opportunity to obtain discovery and present its case if Plaintiff does seek a preliminary injunction. This is nothing more than what Plaintiff requests for itself.

Defendants do not file this Response in order to retain any Middesk property. Indeed, Awad wants only to divest himself of Middesk's property and permanently delete the files in his possession. He has been forthcoming about where the files are located and what he has done with them. He also has confirmed that he performed a thorough review of Baselayer's systems to confirm it did not obtain any Middesk information from Leviloff during his brief employment. Defendants are taking the requisite steps to preserve evidence so there is no threat of anything being lost before Plaintiff can request it in the ordinary course. Awad's download of Middesk files more than two years ago does not justify the extraordinary relief requested. Awad is willing to remediate his possession of Middesk information and ensure he no longer possess any of its files. Plaintiff does not show this is insufficient at this juncture. Plaintiff has not met its burden to show that it cannot wait to obtain additional information relating to its claims in the normal course of

the litigation. For these reasons, and as set forth further below, Defendants respectfully request that the Court deny Plaintiff's order for expedited discovery.

## II.  STATEMENT OF FACTS

Defendant Osiris Ratings, Inc. d/b/a Baselayer ("Baselayer") specializes in combating fraud by offering customers a registry of high-fraud-risk entities that allows customers to understand the fraud risk associated with entities with which they may do business. Declaration of Jonathan Awad ("Awad Decl.") ¶ 11. Plaintiff Middesk, Inc. ("Middesk") sources identity data from publicly available government registries and pulls information on companies relevant to confirming the identities of such entities, such as their age, entity type, and address, to compile the information into a single data set to be sold to customers (the "Identity Data Set"). *Id.* ¶ 7. The information underlying the Identity Data Set is not confidential – anyone could contact the secretaries of state, the IRS, or the other publicly available sources to obtain the same information. *Id.* Defendant Jonathan Awad ("Awad") worked for Middesk as an Account Executive and Partnerships Manager from July 2021 to January 2023. *Id.* ¶ 6.

Approximately a month later, Awad decided to create a new company, Baselayer, that was focused on creating a fraud rating list (a "Reported Fraud List") that would make it significantly easier for financial institutions to prevent fraud and credit losses and to obtain information about companies to detect these potential fraud risks. *Id.* ¶ 10. The Reported Fraud List was created by Awad and his co-founder, Timothy Hyde, along with their team of engineers. *Id.* ¶ 12. The Reported Fraud List needs a source of identity information to identify a business when attempting to retrieve data from Baselayer's database. *Id.* ¶ 13. This identity information could be pulled from the first-party data sources, such as the secretaries of state, or could be pulled from a third-party provider, like Middesk. *Id.*

Accordingly, on July 21, 2023, Baselayer and Middesk entered into an Integration & Reseller Agreement (the "Reseller Agreement") for the Identity Data Set to be one of the sources of information underlying the Reported Fraud List. *Id.* ¶ 15. Baselayer was to be provided with a

key retrieval from Middesk for each new customer using Baselayer's product that would pull information from Baselayer's Reported Fraud List and tie it to a unique business identity from Middesk's Identity Data Set related to a company search. *Id.*

By November 2023, Baselayer launched its website and was prepared, in reliance on the Reseller Agreement, to roll out the Reported Fraud List to its customers. *Id.* ¶ 16. Middesk had other ideas. After viewing Baselayer's website, Middesk decided it would no longer perform its obligations under the Reseller Agreement because its CEO believed that Middesk may want to create its own version of Baselayer's product in the future. *Id.* ¶ 17. Instead of fulfilling the Reseller Agreement, Middesk sent a letter to Awad on November 20, 2023 reminding Awad of his confidentiality obligations to Middesk under his former employment agreement and under the Reseller Agreement. *Id.* ¶ 19.

Baselayer was forced to delay the rollout of the Reported Fraud List for several months and, as a result, Baselayer either lost the customers it had lined up or was forced to embarrassingly delay providing the service to the customer. *Id.* ¶ 18. It took several months of intense work, but Baselayer finally was able to secure new sources of the identity data for the Reported Fraud List. *Id.* ¶ 20. Middesk's breach of the Reseller Agreement forced Baselayer to start competing with Middesk in one respect because it would now had its own identity data set. *Id.* Of course, Baselayer's Reported Fraud List is still entirely separate from, and does not compete with, any Middesk product, since Baselayer's product incorporates fraud data and provides fraud ratings, whereas Middesk simply provides the identity data.

While Awad was employed at Middesk, he regrettably downloaded to his personal Google Drive a folder containing the Files. *Id.* ¶ 21. With one possible exception, Awad has not accessed, viewed, or touched the Files since he left Middesk over two years ago. *Id.* He has not shared these Files with anyone at Baselayer and he has not used or relied on them for Baselayer purposes. *Id.* A copy of the folder was found on Baselayer's Google drive, along with one single Middesk PowerPoint deck, both of which Awad deleted before this lawsuit was filed. *Id.* ¶ 23. Awad believes the Files relate to the customer deals that he worked on while at Middesk from 2021 and

2022, though he cannot say for sure, given the amount of time since he last viewed them. *Id.* ¶ 21. These Files would not even be of use to Baselayer as they are long outdated, do not relate to Baselayer's product, and Baselayer sells to customers based on very different value propositions from Middesk. *Id.* ¶¶ 21-22. Awad has no interest in any of the information in the Middesk Files and does not want to possess them. *Id.* ¶ 25. He will delete them as soon as permitted to do so. *Id.*

Defendant Josh Leviloff contacted Awad via LinkedIn on January 20, 2025 to express his interest in applying for an open role at Baselayer. *Id.* ¶ 26. After Awad and several others at Baselayer interviewed Leviloff, Baselayer decided to him as an Account Executive. *Id.* Leviloff signed his offer letter with Baselayer on February 1, 2025. *Id.* ¶ 27. Recognizing that Baselayer and Middesk have overlapping areas in their businesses and that Baselayer would not want Leviloff to violate any agreements he later signed with Middesk, Awad texted Leviloff to remind him not to sign a noncompete agreement with Middesk as he departed the company. *Id.* ¶¶ 28-29. Awad also told Leviloff that there was no need to rush to tell Middesk where he would be working next, knowing that such information would eventually be announced publicly on LinkedIn. *Id.* ¶¶ 28, 30.

Before Leviloff officially resigned, Awad sent him a text message asking whether Middesk still used two specific vendors as data sources. *Id.* ¶ 31. This ill-conceived text was Awad's attempt to confirm information he already knew about Middesk and understood not to be confidential. *Id.* ¶¶ 32-34. Indeed, the identity of vendors is not considered proprietary information in the industry. *Id.* ¶ 34. Further still, if Leviloff was not permitted to reveal this information related to Middesk, Awad made it clear in his text that Leviloff should not disclose the information. *Id.* ¶¶ 31, 35. Awad discussed the request with Leviloff thereafter, and Awad understood that Leviloff did not obtain any new information related to Middesk's sources of data. *Id.* ¶ 37. Awad did not ask for any Middesk files from Leviloff and Awad and Baselayer did not receive any Middesk files from Leviloff. *Id.* ¶¶ 37-38

Leviloff started his employment with Baselayer on February 24, 2025 and he updated his LinkedIn account around the same time to reflect his new employment with Baselayer. *Id.* ¶¶ 40-

41. Shortly thereafter, on March 3, 2025, Awad and Baselayer received a letter from Middesk's attorney alerting Awad and Baselayer of Middesk's concerns that Leviloff may have taken Middesk's confidential information prior to his departure. *Id.* ¶ 42. That letter did not indicate that Middesk had any concern about Awad's retention of Middesk information and Middesk never even mentioned this to Baselayer or its attorneys until this lawsuit was filed. *Id.* In response to the March 3 letter, Baselayer immediately placed Leviloff on paid leave, took his Baselayer computer, instructed Leviloff to do no work for Baselayer, and removed his access to Baselayer's computer and systems. *Id.* Baselayer searched Leviloff's Baselayer computer, his Baselayer email account, and his Baselayer Google Drive and found no evidence whatsoever that Leviloff uploaded or shared any Middesk information on any of the devices or systems. *Id.* ¶ 45. However, in light of the ongoing dispute with Middesk, Leviloff remains on leave and his access to Baselayer's computer and systems has not been restored. *Id.* ¶ 43.

## III.   ARGUMENT

### 1.     <u>Applicable Legal Standards.</u>

Plaintiff overstates the extent to which courts in the Southern District have rejected the *Notaro* test in favor of the more flexible "good cause" standard in connection with requests for expedited discovery. Courts in this district routinely apply both tests (*See TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*, No. 24-CV-6150 (JMF), 2024 WL 4627452, at \*10 (S.D.N.Y. Oct. 30, 2024), *reconsideration denied sub nom. TushBaby, Inc. v. Jinjang Kangbersi Trade Co, Ltd*, No. 24-CV-6150 (JMF), 2024 WL 4769686 (S.D.N.Y. Nov. 13, 2024)), and use the *Notaro* factors to inform the determination of whether the plaintiff has shown good cause for the discovery. *See e.g.*, *Shaughnessy v. Scotiabank*, No. 22 CV 10870 (LAP), 2024 WL 1350083, at \*3 (S.D.N.Y. Mar. 29, 2024); *Levy v. Young Adult Inst., Inc.*, No. 13-CV-2861 (JPO), 2015 WL 170442, at \*11 (S.D.N.Y. Jan. 13, 2015) (noting that the same flaws in the plaintiffs' arguments under the *Notaro* test render the request for expedited discovery "unreasonable" under the more flexible test). Even under the more flexible standard of "reasonableness and good cause," courts must still apply

"particularly careful scrutiny" since the plaintiff is seeking relief on an expedited basis. *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005).

## 2.    Plaintiff Has Not Shown Good Cause For The Requested Discovery.

There is no threat of ongoing harm to Middesk to justify expedited discovery. There are two categories of information at issue: (1) the Files (which make up the bulk of the allegedly misappropriated information), and (2) the name of two Middesk vendors that Awad texted Leviloff about in February 2025. There cannot be good cause for expedited discovery based on Awad's possession of the Files when the alleged trade secrets are more than two years old and Plaintiff has known for many months that information may be in Awad's possession. *See e.g.*, *GeigTech E. Bay LLC v. Lutron Electronics Co., Inc.*, No. 18 CIV. 5290 (CM), 2018 WL 4360792, at *4 (S.D.N.Y. Sept. 5, 2018) (denying motion for expedited discovery where information underlying the plaintiff's claims had been available to the plaintiff for eight months). Middesk offers no proof that the information still holds value and could cause continuing harm warranting expedited discovery.

Middesk must realize that it cannot justify expedited discovery based on years-old files so it has invented a conspiracy between Defendants and Leviloff to steal Middesk's trade secrets. As explained below, the premises underlying this theory are erroneous and unsupported. Leviloff's interactions with Defendants do not create the risk of ongoing harm that can only be redressed through expedited discovery. Leviloff was an active Baselayer employee for approximately a week until he was put on paid leave in the beginning of March. Awad Decl. ¶¶ 40-43. There is no continuing threat he will disclose or use Middesk confidential information for Baselayer. Moreover, Middesk presented no evidence suggesting that Baselayer sought, is using, or has any Middesk *confidential* information from Leviloff. Awad understood that the information he asked for was not confidential but, if it were, that Leviloff would not provide it. *Id.* ¶¶ 33-35. Awad has confirmed for the Court under penalty of perjury that Leviloff did not provide any new information or give Baselayer any Middesk files he allegedly obtained at the end of his employment. *Id.* ¶¶ 37-38. Awad has also affirmed that he conducted a thorough search of Baselayer's systems and

Leviloff's email for any other information that Leviloff could have brought from Middesk. *Id.* ¶ 45. Baselayer found nothing. *Id.*

Middesk's arguments to the contrary are unavailing. First, there is no evidence that Defendants have sought Middesk information to "aid a competing business." Dkt. 8 at 13. Second, Plaintiff has not shown that any of the information at issue constitutes a Middesk trade secret. Those allegations are conclusory and without evidentiary support. Third, Awad sent a single text message to Leviloff asking about two vendors; Defendants did not engage in any sort of "scheme" to steal Middesk information. *Id.* Fourth, the Middesk information at issue is not "valuable" to Baselayer and cannot "cause substantial damages" to Middesk. *Id.* Finally, there is no evidence that Baselayer has any of the "dozens" of Middesk documents that Leviloff allegedly took. *Id.*

The Files were not, and could not have been, taken to aid a competing business and certainly cannot evidence any "scheme" to take Middesk information. Awad had not started Baselayer when Middesk let him go in January 2023. Awad Decl. ¶¶ 9-10. Indeed, Awad had not even conceived of the idea to start Baselayer until over a month after he left Middesk. *Id.* ¶ 10. Awad started Baselayer with a co-founder, Timothy Hyde, and an engineering team, who built out the company's product *without* any information from Middesk. *Id.* ¶ 12. Awad is not an engineer, does not code, and was not involved in any such product development while at Middesk. *Id.* ¶ 8. Middesk does not, and cannot, allege that Awad took any confidential information that could possibly have been used to build Baselayer's product. Awad has also averred that he does not recall opening the Files after leaving Middesk[1], never shared them with anyone at Baselayer, and does not even recall specific information in the Files that could have been useful for competing with Middesk. *Id.* ¶¶ 21-22. Awad therefore did not use, and could not have used, any Middesk information to build out Baselayer.

---

[1] There is a single possible exception of one file that may have been opened in September 2023. Awad Decl. ¶ 21. Awad does not recall doing so but it would not have been unusual or problematic given that was during the parties' partnership. *Id.*

It is further illogical for Middesk to claim that Awad improperly used its confidential information to start a competing business because the two companies were not even competitors when Awad left in January 2023. Baselayer was conceived of as a fraud detection tool. *Id.* ¶ 11. Middesk did not have a fraud product while Awad worked there (*id.*) and therefore none of the alleged confidential information could possibly relate to such a business. *See* Dkt. 8 at 4 (alleging that Awad took information about Middesk's *lien-search product*, non-specific product launch plans, and non-specific product strategy and growth plans) (emphasis added). Moreover, in the initial months of Baselayer's existence, Baselayer actually partnered *with* Middesk to use Middesk's data sets for Baselayer's product. Awad Decl. ¶ 15. The partnership lasted until November 2023 when Middesk's CEO abruptly ended the relationship because he decided Middesk might want to build the same product. *Id.* ¶ 17. Notably, Middesk did *not* claim that Baselayer must have been built using its confidential information even though it knew exactly what Baselayer planned to do by November 2023 at the latest. Baselayer's launch was delayed months due to Middesk pulling its data sources so Baselayer only even went live more than a year after Awad left Middesk.

Plaintiff exaggerates the importance and sensitivity of the information Awad sought from Leviloff. Plaintiff gives the impression that Awad sought Middesk's most sensitive, confidential information. Not so. Awad asked Leviloff to confirm the identity of vendors that Middesk may use for two pieces of data which make up a small portion of the data it can provide to customers. *Id.* ¶ 31. This information cannot directly aid Baselayer or cause any damage to Middesk, let alone the "substantial" damages alleged by Middesk. Awad did not even believe that the information would be considered confidential. *Id.* ¶¶ 7, 34. Moreover, Baselayer and Middesk do not even compete on the identity of which vendor supplies the information at issue so it could not help Baselayer win any business from Middesk. *Id.* ¶ 33. Baselayer customers care what the company does with the data, not where it comes from. *Id.*

Plaintiff also gives the misleading impression that Awad directed Leviloff to gather other information and files from Middesk before leaving. Again, not so. Awad does not know what

Middesk's "Product & Data Partnerships Tracker" is and did not ask Leviloff to obtain it. *Id.* ¶ 39. Awad also never instructed Leviloff to lie to Middesk or mislead it about his need for information. *Id.* ¶ 38. In fact, Awad told Leviloff that he should *not* get the vendor information "[i]f you feel weird doing that." Awad further told Leviloff that it would be "all good" if he did not want to get the requested information since Awad "[did not] mind either way." *Id.* ¶ 31. Plaintiff conspicuously left out that portion of the text messages in a blatant attempt to make Awad's request appear more nefarious. Awad never asked or directed Leviloff to obtain any Middesk documents and certainly never instructed Leviloff to delete his browser history or try to hide any of his activities from Middesk. *Id.* ¶ 38. Awad had no idea that Leviloff was supposedly looking into other Middesk information or downloading Middesk files. *Id.* ¶¶ 38, 45.

There is no good cause for expedited discovery based on any supposed "incentive and capacity" to hide misconduct. Dkt. 8 at 14. Awad never took any steps to hide the fact that he had downloaded the Files. Middesk could have found out this information at any time over the past two-plus years but it neglected to do so. Indeed, Middesk did not even look into Awad's history after it abruptly pulled out of a partnership with Baselayer in November 2023 and needed to ensure that Baselayer no longer had access to data sources that *Middesk* itself provided to it. *Id.* ¶ 19. Awad never instructed Leviloff to lie to Middesk or knew that Leviloff may have done so. *Id.* ¶ 38. The text message exchange between the two about Leviloff's LinkedIn certainly does not show that Awad and Leviloff attempted to hide Leviloff's conduct from Middesk. Just the opposite is true. Awad made a tongue-in-cheek reference to when Leviloff inevitably discloses publicly his employment with Baselayer because he thought Middesk may be displeased by one of its employees deciding to join Baselayer. *Id.* ¶ 30. Leviloff subsequently updated his LinkedIn immediately upon starting his Baselayer employment. It was thus evident to Middesk as early as his second day of employment that he joined Baselayer. Baselayer has not used any Middesk information from Leviloff but, even if it wanted to use such information, it could not have put that information to use by the time that Middesk would have known Leviloff was working at Baselayer since he promptly updated his profile to reflect his new employment. *Id.* ¶ 41. No evidence shows

that Baselayer and Leviloff intended to hide his affiliation with the company so that it could surreptitiously use sensitive information he provided.

The cases cited by Middesk are inapposite.[2] In *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005), the court found there was "considerable urgency" to the plaintiff's request because the "defendants are foreign individuals and corporations who have both incentive and capacity to hide their assets." *Id.* at 327. There is no such urgency here. None of the alleged trade secrets will be lost in the absence of expedited discovery. Defendants have been informed of the Court's preservation order and are taking appropriate steps to comply. Awad Decl. ¶ 4. Middesk claims it needs expedited discovery in order to support a motion for preliminary injunction, but Middesk has not stated what relief it could seek in a preliminary injunction that justifies expedited discovery. Defendants have already agreed that they will not use, disclose, or *destroy* any Middesk confidential information. Dkt. 30 (emphasis added). Finally, Defendants stand ready and willing to divest themselves of all Middesk files and have no intention or expectation of retaining the files but for the Court's preservation order and otherwise as may be required by this litigation. *Id.* ¶ 25. Awad also has had the Files for over two years and never accessed them or used them (apart from possibly "editing" one document during the Middesk partnership). *Id.* ¶¶ 21-22. In that entire time, and after a thorough forensic analysis of its own systems, Middesk has no evidence even hinting that Defendants may be misusing Middesk's confidential information.

For these reasons, and as described further below, Plaintiff has not met its burden to show that good cause exists to order the expedited discovery requested.

### 3.    Plaintiff Has Not Met The *Notaro* Factors.

Plaintiff would only be entitled to expedited discovery under *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982) if it shows: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable

---

[2] Defendants will not address *Suber v. VVP Servs.*, No. 20-8177, 2021 WL 1101235 (S.D.N.Y. March 23, 2021) in any detail since that case does not stand for the proposition offered and the cite does not appear to be correct.

injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Id.* at 405. Plaintiff fails under each of the four factors. The failure to meet the *Notaro* factors also reflects the lack of any good cause for expedited discovery, especially the lack of any irreparable harm here.

a)    <u>Plaintiff Has Not Shown It Will Be Irreparably Injured Absent The Requested Relief</u>.

Plaintiff's assertion that it will suffer irreparable harm absent expedited discovery is unspecific and unpersuasive. Irreparable harm cannot be presumed simply because a plaintiff alleges that its trade secrets have been misappropriated. The authority cited by Plaintiff, *FMC Corp. v. Taiwan Giant Industrial Co., Ltd.*, 730 F.2d 61 (2d Cir. 1984), is no longer good law. The Second Circuit directly rejected Plaintiff's proffered interpretation of *FMC Corp.* in 2009. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (holding that is it "not correct" to read *FMC Corp.* as "mean[ing] that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated"). The Second Circuit Court of Appeals clarified that a rebuttable presumption of irreparable harm "*might* be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Id.* at 118 (emphasis added). There is no threat of irreparable harm and monetary damages will suffice when there is no danger that the trade secrets will be disseminated further. *Id.* at 119.

Even assuming that the information at issue constitutes Middesk trade secrets, Middesk has not shown that there is any danger whatsoever of Defendants disseminating the alleged trade secrets. Neither Awad nor Baselayer had given any indication that it wants Middesk information, let alone that either will share the information publicly or provide it to anyone outside of Baselayer. Awad has confirmed that he has not shared the Files within Baselayer, and that he wants just to delete the Files so he no longer has them. Awad Decl. ¶¶ 21-25. Middesk's own allegations undermine any suggestion of irreparable injury. It asserts that Baselayer has already used its trade

secrets to help build its business. Dkt. 1 ¶ 30. Notably, although Middesk cannot even identify any actual damages suffered over the more than two years since Defendants' supposed theft, there also is nothing in the Complaint suggesting that there is some further, irreparable injury it may suffer. As per *Faiveley*, monetary damages would suffice to address the alleged misappropriation and there is no basis for concluding Middesk will suffer irreparable harm.

Plaintiff otherwise makes no attempt to explain how it will suffer *irreparable* injury absent expedited discovery. The alleged trade secrets here are described only in the most generic and conclusory terms. *See* Dkt. 8 at 14-15 (alleging only that the information at issue "is of great value" because "it relates to [Middesk's] business strategy and methodologies" and constitutes "confidential and highly sensitive information about Middesk's business"). Plaintiff does not explain how the years-old information in the Files could still constitute a trade secret, let alone how Awad's continued possession of the trade secret constitutes an irreparable injury. There is no threat to Middesk that Baselayer will disseminate undoubtedly stale information. Middesk is now also receiving all expedited discovery requested from Leviloff. Dkt. 29. This discovery is more than sufficient for Middesk to see that none of the information allegedly taken by Leviloff has ended up with Baselayer since it will provide a complete picture of what Leviloff did after allegedly accessing or taking Middesk's confidential information.

There is no threat of irreparable injury from Awad's request for Middesk vendor information either. This information is not considered proprietary within the industry. Awad Decl. ¶ 34. Middesk even advertises that they obtain their information directly from first-party, publicly available data sources. *Id.* ¶ 7. It is no secret what those public sources may be as there are only so many possibilities to obtain the information Middesk offers. Furthermore, Awad did not even receive any new Middesk information from Leviloff (*id.* ¶ 37) and Leviloff did not provide Awad with any Middesk files. *Id.* ¶ 38. Leviloff is not actively working at Baselayer so there cannot even be any ongoing threat that he may disclose or use additional information that could irreparably harm Middesk.

*Estee Lauder Companies v. Batra* is unhelpful to Middesk. That case involved the plaintiff's attempt to enforce a noncompete covenant against a former employee to stop him from working for a competitor. 430 F. Supp. 2d 158, 160 (S.D.N.Y. 2006). The court assessed the likelihood of irreparable harm in the context of the inevitable disclosure doctrine applicable to restrictive covenant cases. *Id.* at 174. This is not a restrictive covenant case as Leviloff did not even have a post-employment noncompete covenant. *See* Dkt. 1-2. The inevitable disclosure doctrine also cannot be applicable to Leviloff since he worked at Baselayer for approximately a week and has been on paid leave since Baselayer first learned of Middesk's concerns. Awad Decl. ¶¶ 40, 43. Finally, unlike Middesk, the plaintiff in *Batra* made a substantial showing that the defendant knew and developed highly sensitive trade secrets that "could manifest as competitive advantage from knowing the when and how of [the plaintiff]'s future product introductions." 430 F. Supp. 2d at 175-76. There is no such danger from Leviloff.

      b)   <u>Plaintiff's Showing of Likely Success on the Merits is Limited And Does Not Justify Expedited Discovery Against Defendants.</u>

The sole claim that Plaintiff can even arguably make out against Defendants is that Awad retained Middesk information after his employment with Middesk ended. This does not justify expedited discovery. Awad has agreed he will not use, disclose, or destroy any Middesk files, and has confirmed he is willing to divest himself of all such files. Awad has averred further that he did not use or disclose the Files at any time and never accessed those documents after leaving Middesk (save possibly for one). Awad Decl. ¶ 21. Awad also has no intention of retaining the Files any longer and has committed to divesting himself of those documents when permitted. *Id.* ¶ 25. The mere fact that Awad retained the Files, virtually untouched and unshared, cannot justify the broad-reaching expedited discovery requested by Plaintiff.

Middesk has not demonstrated that it is likely to succeed on any other claims asserted against Defendants. Despite (a) its admittedly comprehensive forensic examination of Awad's and Leviloff's activities, (b) the fact that Middesk seemingly had concerns about the protection of its confidential information in November *2023*, and (c) Awad's possession of the Files for over two

years, Plaintiff has no evidence that any of its alleged trade secrets (w) are being used by Baselayer, (x) have been used by Baselayer, (y) have helped Baselayer in any way, or (z) have harmed Middesk in any way. Plaintiff has not established that any of the information at issue constitutes a trade secret. Middesk gives up the game when it says that it believes the evidence collected "is just the tip of the iceberg." Dkt. 8 at 15. This is not a statement that Middesk knows it can succeed on the merits; it reflects an attempted fishing expedition to find evidence in support of its rank speculation that Defendants somehow used Middesk information for their own competitive gain. As explained in Section II.B. above, such speculation is ill-founded.

c)    <u>Plaintiff Has Not Shown a Connection Between The Requested Discovery And The Alleged Injury</u>.

There is no connection here between the extensive discovery sought and any alleged injury suffered by Middesk. As established in Section III.C.i. above, Middesk cannot be irreparably damaged by the information allegedly in Defendants' possession. Middesk otherwise has not shown or explained any actual injury that it has suffered through Defendants' supposed scheme to steal Plaintiff's information and start a competing business. Moreover, the requested discovery is not remotely tailored to the allegations made against Defendants. Awad has not worked at Middesk in more than two years. Awad could only have obtained Middesk information while he had access to it during his employment. Information about what he downloaded or emailed himself is uniquely within Middesk's control. Awad is willing to fully remediate his possession of any Middesk files, though Plaintiff has no basis for suggesting that any information therein has been used at any time. Awad acknowledges that he asked Leviloff for vendor information, but that Leviloff never provided any new Middesk vendor information or any other Middesk file to Baselayer. Finally, Plaintiff suggests that it will be moving for a preliminary injunction but does not identify any specific relief it will seek that requires the expedited discovery sought. There cannot be any connection between the requested discovery and any injury in light of these facts.

The cases cited by Plaintiff do not support its assertion that expedited discovery can be ordered based on mere *allegations* of misappropriation without any indication that the information

at issue has actually been used. In *Sapient Corp. v. Singh*, 149 F. Supp. 2d 55 (S.D.N.Y. 2001), there is no discussion whatsoever about the expedited discovery ordered and no suggestion that it was ordered based on allegations of trade secret use. *Id*. at 57-58 (noting only that the court granted a previous request for expedited discovery). *IKON Office Solutions, Inc. v. Leichtnam* is also distinguishable. The plaintiff in that case sought discovery in connection with a preliminary injunction it filed to prevent the defendants from contacting the plaintiff's customers and engage in unfair competition. No. 02-721, 2003 WL 251954, at *1 (W.D.N.Y. Jan. 3, 2003). The only discussion of the plaintiff's trade secret claim came in the context of a motion to dismiss filed by the defendants. *Id.* at *3. Nothing in that decision indicates that the plaintiff had "some evidence" of misappropriation or that expedited discovery was granted based on allegations of misappropriation, as Plaintiff claims. Dkt. 8 at 16.

        d)     <u>Plaintiff's Alleged Injury Does Not Outweigh The Burden, Inconvenience, And Harm to Defendants From The Requested Discovery</u>.

Plaintiff cannot show that it will suffer any injury if it does not obtain discovery on an expedited basis rather than in the ordinary course of discovery. Middesk has no explanation for the supposed urgency in this situation. There is no threat that any Middesk trade secrets will be used or disclosed absent the requested discovery. There is already a preservation order in place which Defendants are complying with. Awad Decl. ¶ 4. Awad only wants to return the Middesk information in his possession. The information in the Files is also many years old at this point. Middesk has offered no evidence that it is, or ever was, competitively valuable and useful to Baselayer. Middesk also has not shown that any information obtained or requested by Defendants is competitively valuable or could harm Middesk in any way, let alone in a manner that necessitates *immediate* discovery from Defendants. Middesk deliberately conflates Defendants' conduct with that of Leviloff – there is nothing before the Court suggesting that *Defendants* lied to Middesk to obtain its confidential information as Middesk asserts. Dkt. 8 at 17. It is wholly speculative to suggest there would not be a "fair record" for a preliminary injunction absent expedited discovery.

Middesk downplays the significant burden, inconvenience, intrusion on privacy interests, and potential harm to Defendants of the requested discovery on an expedited basis. Without any safeguards whatsoever, Middesk wants (1) Awad's personal Apple ID password, (2) Awad's personal devices, (3) Awad's Baselayer computer, (4) Awad's Baselayer email account, and (5) all Baselayer accounts or systems that Leviloff "connected to or emailed." It is a gross intrusion into Awad's privacy to expect him to provide a third-party with his personal Apple ID password, which could be used to access his personal iCloud, email, and any other account connected to this ID. Middesk justifies this request by claiming that the email account is linked to his Middesk computer, which supposedly cannot be accessed or analyzed without the ID and password. Dkt. 1-3 ¶ 14. It makes no sense to require this information to access the *Middesk* laptop which is not in Awad's possession and has not been used by him in over two years. It is similarly intrusive on Awad's privacy to require him to hand over all personal devices that may have been used to communicate with Leviloff. Awad obviously uses such devices for purely personal matters that have nothing to do with this case and for which he is entitled to his privacy. Leviloff's agreement to provide access to his own accounts also obviates the need to require the same from Awad since Middesk can get the information about Awad's alleged communications from Leviloff.

It would also create serious burden and inconvenience to Baselayer by requiring its CEO to hand over his computer and try to determine all "accounts or systems" that Leviloff "connected to" or emailed. Dkt. 8 at 22. As an initial matter, it is unclear what it would mean for Leviloff to have "connected to" an "account or system" and how the Court or the parties could reasonably determine what would be subject to review. This could encompass every Baselayer account or system if Leviloff was simply given access to them or a log-in. The request would also mean that Baselayer would need to provide access to every single email account to which Leviloff ever sent a message, regardless of the substance or context. If Leviloff sent a single company-wide email, this would require Baselayer to provide access to the email accounts of each of its employees. This is indisputably excessive, inconvenient, and not justified by Plaintiff's submission.

Finally, Middesk makes no accommodation for the fact that it considers Baselayer to be a direct competitor but is asking for far-ranging access to the accounts and systems of its employees, including its co-founder and CEO, Awad. Middesk expresses significant concern for the protection of its own trade secrets but ignores that Baselayer has a reciprocal interest in protecting its trade secrets from exposure to Middesk. Plaintiff claims it will suffer considerable harm due to Defendants' alleged possession of its alleged trade secrets. It cannot then dispute that Baselayer would be harmed by the exposure of its own trade secrets. Middesk's suggestion that Defendants' objection would be based on an "injury from being forced to refrain from possessing or using confidential information and trade secrets" is a red herring. Dkt. 8 at 16. Defendants have no interest in retaining that information and confirmed they want to return it. Their possession of any Middesk information can easily be redressed without resort to the extensive discovery sought here. Finally, Plaintiff has not shown that any of the forensic discovery sought would reasonably be part of standard discovery in this case such that it is only a matter of timing for this discovery. *Id.* The same objections described above would apply regardless of whether Plaintiff sought the discovery on an expedited basis or during the ordinary course. Plaintiff may indeed have the ability to obtain the production of *documents* as part of the litigation. There is no reason why that would not be sufficient under the circumstances.

For the above reasons, the requested expedited discovery does not meet the *Notaro* factors and should not be ordered. To the extent that the Court does determine that any forensic discovery is warranted at this time, it should only be ordered on the basis that there will be appropriate safeguards for Defendants' personal, sensitive, proprietary, and confidential information, the analysis will only be conducted by a neutral, mutually-agreeable third-party forensic analyst, the discovery will cover only those locations where Middesk files are located, and the scope will be narrowly tailored to the retrieval and deletion of Middesk files.

4.    **The Requested Discovery Is Excessive, Overly Burdensome, And Not Supported By The Alleged Evidence Provided By Plaintiff.**

As described above, the requested forensic discovery cannot reasonably be described as "narrow" and "reasonably tailored." It is overly broad and unduly burdensome, untethered to the limited factual allegations offered against Defendants, and unnecessary to prevent any ongoing or future harm. Plaintiff seeks *carte blanche* access to Defendants' accounts and devices, whether used for business or personal reasons. In so doing, Plaintiff overstates the extent of the findings of its IT expert. Nothing in the expert's declaration (Dkt. 1-3) supports his supposed conclusion that all (or any) of the devices and accounts at issue "were involved in the scheme to steal Middesk's confidential information and trade secrets." Dkt. 8 at 19. Nor does anything in the declaration support a conclusion that forensic analysis is needed "to learn the full extent of what Defendants took and where it now resides." *Id.* Middesk can obtain this information in the ordinary course of discovery without the significant burden imposed on Defendants by expedited discovery.

The cases cited by Plaintiff do not warrant the extraordinary relief Middesk requests from Defendants. The discovery ordered in *Citibank, N.A. v. Mitchell* was deemed "appropriately narrow in scope" insofar as it was sought from the defendants themselves, each of which was a former employee of the plaintiff who had only recently left to join a competitor. No. 24-CV-08224-CRB, 2024 WL 4906076, at *2, *7 (N.D. Cal. Nov. 26, 2024). The court expressly rejected the plaintiff's request to order expedited discovery from the plaintiffs' new employer though. *Id.* at *7. The case thus supports the discovery sought from *Leviloff* – which Plaintiff is already receiving – but not from Awad (who has not worked there in two years) or Baselayer. Indeed, Middesk's argument on this point focuses only on *Leviloff's* conduct in connection with his departure from Middesk, except to grossly misrepresent that "Leviloff did so at the express direction" of Awad. *See* Awad Decl. ¶ 38. *Comet Technologies United States of America Inc. v. Beuerman* is similarly inapplicable. The court there found that the discovery sought was "limited enough in scope that any prejudice to Defendant is outweighed by the need for expedited discovery" because the

plaintiff sought only a deposition. No. 18-CV-01441-LHK, 2018 WL 1990226, at *7 (N.D. Cal. Mar. 15, 2018).

None of the other cases cited by Plaintiff support an order requiring Middesk's competitor to provide broad access to its systems and devices. *See e.g.*, *Ceglia v. Zuckerberg*, No. 10-CV-00569A F, 2013 WL 1208558, at *1 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted*, No. 10-CV-00569-A, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015) (discussing a forensic examination conducted for the express purpose of determining the authenticity of a single document); *Pyro Spectaculars N., Inc. v. Souza*, No. CIV S-12-0299 GGH, 2012 WL 13220023, at *3 (E.D. Cal. Feb. 8, 2012), *amended in part*, No. CIV S-12-0299 GGH, 2012 WL 13220022 (E.D. Cal. Feb. 23, 2012) (addressing the forensic examination of the *individual defendant*'s computer and electronic storage media, not the devices and accounts of his new employer); *LC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *4 (N.D.N.Y. Dec. 12, 2011) (ordering forensic examination of the defendants' computer systems only *after* briefing on the preliminary injunction motion and a hearing based on numerous witness declarations, admissions, and live testimony that supported multiple factual findings by the court on the trade secret status of the information and the defendants' use thereof).

Although less intrusive than the forensic discovery requested, Plaintiff's written discovery requests are no less burdensome or unnecessary in light of the lack of any demonstrable harm or irreparable damage to Middesk. First, the written requests use the broad term, "Middesk Documents or Information," which is defined as "any document drafted by Middesk, with Middesk metadata in it, or containing Middesk's confidential or proprietary information and/or trade secrets." Dkt. 8 at 18. Defendants have no way to pinpoint every single document that may have been "drafted by" Middesk, nor does the fact that a document was *drafted by* Plaintiff mean that it is an appropriate or necessary subject for expedited discovery. For example, this request could cover Awad's confidentiality agreement and the Reseller Agreement, neither of which is needed on an expedited basis. It would also be practically impossible for Defendants to determine if a file contains Middesk metadata or whatever Plaintiff believes would constitute its confidential

information. To the extent Middesk only wants the production and return of Middesk documents that Awad downloaded or sent himself, Awad has no problem sending those back to Middesk and confirming the permanent deletion of the Files. Awad further has no problem confirming in a written interrogatory response the extent of the Middesk files in his possession and where those items are located. That information is in his Declaration. The requests which incorporate this term are otherwise ambiguous, overly broad, and unduly burdensome for purposes of a response.

Multiple other requests are similarly broad and go beyond any information that Middesk could need on an expedited basis for a preliminary injunction motion. Middesk has no explanation for why it would need documents and communications about Leviloff's potential exit from Baselayer or his personnel file. Documents and communications reflecting an investigation into Leviloff's conduct also have no relation to the need to protect trade secrets, and would directly implicate the attorney-client privilege. Middesk further has no reason to ask for *any* emails reflecting the solicitation of other Middesk employees given that this is not a nonsolicit case and Plaintiff does not allege that any other former Middesk employees joined Baselayer or provided any alleged confidential information. Finally, the interrogatories seeking (1) the identity of all Awad devices, accounts and data sources, (2) the identity of all Baselayer devices, accounts, and "data sources" used by Awad or Leviloff for Baselayer business, and (3) the identity of all Baselayer employees who communicated with Leviloff are severely overbroad because they are not cabined by the allegations made in the case, pose a severe practical difficulty for Defendants to comply with, and use the very broad and ambiguous term "data sources."

## IV.    THE REQUESTED DISCOVERY IS INEQUITABLE

Plaintiff seeks unilateral discovery from Defendants to use in support of an intended forthcoming preliminary injunction motion but makes no allowance for any discovery from Defendants. Defendants should be afforded the same opportunity as Plaintiff to propound written discovery and take depositions, if such discovery is allowed at all. Middesk bears the burden of establishing its entitlement to a preliminary injunction, including a likelihood of success on the

merits and the need to prevent irreparable harm. *See e.g.*, *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Among other things, this will require Middesk to prove that it can meet all of the elements of its Defend Trade Secrets Act (the "DTSA") claim, such as that the alleged trade secrets provide value to its business (Dkt. 1 ¶ 105), it took reasonable efforts to preserve the confidentiality of its trade secrets (*id.* ¶ 106), the specific pieces of alleged confidential information are not publicly known and derive value from their secrecy (*id.* ¶ 107), and the confidential information otherwise meets the definition of a "trade secret" under the DTSA. *Id.* ¶ 109. Middesk will also again need to show that it would suffer irreparable harm in the absence of an injunction. Such information is uniquely within Plaintiff's control and should be the subject of discovery so Baselayer has a full and fair opportunity to assess the viability of Plaintiff's arguments and present a defense to any request for injunctive relief.

## V.    CONCLUSION

Plaintiff has not demonstrated that it should be entitled to expedited discovery under either standard applied by courts within the Second Circuit. Plaintiff's request for the expedited discovery set forth in the Order to Show Cause should therefore be rejected. In the event that the Court determines that some expedited discovery is appropriate, Defendants should have the ability to propound the same number of document requests and interrogatories and take the same number of depositions as Plaintiff (to the extent these are allowed), and any forensic discovery should (i) have appropriate safeguards for Defendants' personal, sensitive, proprietary, and confidential information, (ii) only be conducted by a neutral, mutually-agreeable third-party forensic analyst, (iii) cover only those locations where Middesk files are located, and (iv) be narrowly tailored to confirming the extent of Middesk files in Defendants' possession and remediating that issue.

Dated: April 9, 2025

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

s/ *Matthew D. Gorman*
Matthew D. Gorman (#MG1530)
One Boston Place
201 Washington Street, Suite 2000
Boston, Massachusetts 02108
Telephone: (617) 598-7800
Facsimile: (866) 974-7329
Email: mgorman@wsgr.com

Heather G. Diles (#5584966)
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: hdiles@wsgr.com

*Counsel for Defendants Osiris Ratings, Inc.
and Jonathan Awad*

## **CERTIFICATION OF COMPLIANCE WITH THE WORD LIMIT**

Pursuant to Local Civil Rule 7.1, Defendants Osiris Ratings, Inc. d/b/a Baselayer and Jonathan Awad states that its Memorandum of Law In Response to Plaintiff's Order to Show Cause for Expedited Discovery, filed on April 9, 2025, complies with the 8,750 word limit. The memorandum of law is 8,688 words.

Dated: April 9, 2025                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

s/ *Matthew D. Gorman*
Matthew D. Gorman (#MG1530)
One Boston Place
201 Washington Street, Suite 2000
Boston, Massachusetts 02108
Telephone: (617) 598-7800
Facsimile: (866) 974-7329
Email: mgorman@wsgr.com

Heather G. Diles (#5584966)
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: hdiles@wsgr.com

*Counsel for Defendants Osiris Ratings, Inc. and Jonathan Awad*