# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MIDDESK, INC., | Case No. 1:25-cv-02677-KPC |
| Plaintiff, | **DECLARATION OF JONATHAN AWAD IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S ORDER TO SHOW CAUSE FOR EXPEDITED DISCOVERY** |
| V. | |
| OSIRIS RATINGS, INC. et al., | |
| Defendants. | |

I, JONATHAN AWAD, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration and if called upon to do so, I could and would testify competently to all of the matters contained herein.

2. I am the co-founder and Chief Executive Officer of Osiris Ratings, Inc. d/b/a Baselayer ("Baselayer" or the "Company").

3. I make this declaration in support of the Response to Plaintiff's Order to Show Cause For Expedited Discovery.

4. I have received a copy of the Court's April 2 Order and April 4 Order (the "Orders") in this action. I am complying with the Orders' requirements to maintain and safeguard, without alteration, modification, or deletion, all electronic devices set forth therein in my possession, custody, or control, or which contain any documents concerning the subject matter of this action. I have also taken appropriate steps to ensure that Baselayer is also complying with the Orders' preservation requirements.

**Founding Baselayer**

5. My background is as an entrepreneur and working in the banking, underwriting, and fraud space. Right out of college, I was the co-founder and Chief Investment Officer of Lex Markets, the first licensed commercial real estate marketplace in the United States, which raised $28 million in funding. After Lex Markets, I then worked in investment banking at Lazard,

working on transactions between the largest banks, lenders, and asset managers in the world, where I learned an immense amount of information on the financial services industry. After Lazard, I worked at OakNorth Bank's underwriting arm, OakNorth Platform, where I was one of their first US employees and I was instrumental in securing one of the first customers, SMBC, the sixth largest bank in the world, for OakNorth's new underwriting software.

6. After I left OakNorth, I joined Middesk, Inc. ("Middesk") and worked there from July 2021 to January 2023, first as an Account Executive and then as a Partnerships Manager.

7. Middesk's product, at a high level, provides customers with a data set compilation. In order to create these data sets, as Middesk states on their website at https://www.middesk.com/kyb-business-verification-api, Middesk sources their data from publicly available government registries, including the fifty secretaries of state and the IRS to pull identity information on companies, such as their age, entity type, and addresses (see screenshot below). Once Middesk has this information, it collects all the information and serves it to customers as a single data set (the "Identity Data Set"). None of the information that underlies Middesk's Identity Data Set is confidential – it is widely understood and advertised that they obtain the information directly from the first-party, publicly available data sources.



8.	While at Middesk, I was involved in selling the Middesk Identity Data Set to potential customers and partners. As part of our sales pitch at Middesk, we were instructed to discuss the data we were selling, the sources of it as told to us by the senior team, and to be as transparent as possible about the source of the data we were providing – this transparency was part of the sales pitch itself. I am not an engineer so I never worked, in any capacity, on the development, design, or creation of Middesk's product. I had no involvement in developing the code for Middesk's product and no knowledge of how it was created.

9.	Towards the end of my tenure at Middesk, I became vocal about my frustration with the strategic direction of Middesk. I believed Middesk should focus solely on the section of its business related to business identity verification and to move away from the payroll and tax registration business. The products in the payroll and tax registration business were, in my opinion, not innovative, the sales cycle took too long, and it was nearly impossible for the sales employees to hit quota. However, my manager disagreed with my ideas with the direction for the company, and we parted ways in January 2023.

10.	In February 2023, I was focused on creating a new product that would make it significantly easier for financial institutions to prevent fraud and credit losses and to obtain information about companies to detect these potential fraud risks. This new product became Baselayer and I incorporated the company in February 2023 with my co-founder, Timothy Hyde, who became the Company's CTO.

11.	The idea behind Baselayer was to combine information about companies known for fraudulent behavior from banks and lenders who had previously been defrauded ("Fraud Data") to create a real-time fraud consortium to power a risk rating on the company based on all of the information from the conglomerate of data sets (a "Reported Fraud List"). This Reported Fraud List would allow a customer to search for a business's name to see if that business may be a fraud risk based on the information Baselayer collects from various data sources. The Reported Fraud List tells customers if a company is real, what the credit risks of the company are, and what the

Docusign Envelope ID: 7D853504-94D6-435A-B64F-5A8271DED994
Case 1:25-cv-02677-PKC    Document 33-1    Filed 04/09/25    Page 4 of 14

fraud risks are of that company, among other things. Middesk does not offer such a product and never offered, nor had plans to offer, such a product while I worked there.

12. After committing to the idea for Baselayer, Mr. Hyde and I needed to actually create the product. As mentioned, I am not an engineer. I have never coded. Therefore, I relied on Mr. Hyde to lead the product development with a team of engineers we hired to help create the Reported Fraud List. None of Middesk's information was used to create the product itself, nor would it even be possible for Middesk's information to be used, as Middesk does not have a version of this product, did not have a version of this product while I worked there, and had no plans to create a version of this product as far as I was aware. I did not even know enough about how Middesk created its product to be able to assist Mr. Hyde and the engineers in developing Baselayer. Additionally, neither Mr. Hyde nor any of the engineers we hired had previously worked at Middesk. I have no reason to believe any of them had any Middesk confidential information when they were developing Baselayer.

13. The Reported Fraud List requires the use of data sets. The Fraud Data itself must be pulled from banks and lenders willing to supply it, so such Fraud Data is all proprietary information to Baselayer, obtained with permission from the institutions. The Reported Fraud List must also have identity information (e.g. business ages, entity types, and addresses) to identify a business when attempting to retrieve data from Baselayer's database, which is tied to the government registry records to keep a consistent architecture of business identity. This identity data can be pulled from first-party data sources, such as the secretaries of state, the IRS, court websites, or the USPS database. Alternatively, some or all of this identity information could be pulled from third-party data sources, such as from Middesk's Identity Data Set which already compiles the data from the secretaries of state. My initial plan when starting Baselayer was to partner with Middesk for it to provide Baselayer with the Identity Data Set, not re-create it from taking the data directly from the secretaries of state. I was familiar with Middesk's practice of partnering with companies like Baselayer since that had been my job right before I left Middesk.

Middesk regularly forms such partnerships with companies that will pay Middesk for access to its Identity Data Set and Middesk had secured over sixty such partners during my time there.

14. Even though I had differences of opinion with Middesk about the best direction for the company, I still had an amicable relationship with Middesk and sought a partnership with Middesk soon after my departure. I was not interested in creating a business competitive to Middesk – i.e. I was not interested in re-creating Middesk's Identity Data Set, but I was instead interested in partnering with Middesk to resell Middesk's Identity Data Set (similar to the sixty-plus other partners of Middesk), in conjunction with the new product I was working on that eventually became Baselayer.

15. On July 21, 2023, Baselayer and Middesk entered into an Integration & Reseller Agreement (the "Reseller Agreement"), signed by Middesk's CEO Kyle Mack and me, by which Baselayer would be a reseller of Middesk's Identity Data Set. Baselayer intended to use Middesk's Identity Data Set as one of Baselayer's sources of information underlying the Reported Fraud List. Essentially, Baselayer was to be provided with a key retrieval (i.e. an individual API) from Middesk for each new customer using Baselayer's product that would pull information from Baselayer's Reported Fraud List and tie it to a unique business identity from Middesk's Identity Data Set related to a company search.

16. From July through mid-November, Baselayer developed and tested its product using Middesk's Identity Data Set. I was very excited to launch this partnership with Middesk and I lined up customers to launch Baselayer's product in reliance on the Reseller Agreement.

17. However, after I launched Baselayer's website, in mid-November 2023, I received a phone call from Middesk's Partnership Manager, Jared Gilmore. Mr. Gilmore informed me that after extensively viewing Baselayer's website, Mr. Mack thought Middesk might want to create its own version of such a product one day and thus, Middesk was not going to perform its obligations under the Reseller Agreement. Middesk never expressed such an intention while I worked there and I was unaware of any plans that Middesk had to create its own version of Baselayer's product. The other sixty-plus partner resellers that Middesk had at the time also

developed their own products on top of the Middesk Identity Data Set, as that was the core function of the partnership, yet Middesk singled out Baselayer as the partner with which Middesk would breach its reseller agreement. To date, Middesk has not created its own fraud consortium to compete with Baselayer's Reported Fraud List.

18. Once Middesk pulled out of the Reseller Agreement, I was suddenly left with a product at Baselayer that I was imminently about to launch but for which I no longer had one of the core five data sets necessary to use to run it. In other words, Middesk left me without the ability to run the Reported Fraud List and I was forced to punt the launch of the product for several months while I scrambled to find new sources of the identity information, one of the core data sets I needed for the product. Specifically, I was forced to either lose customer contracts entirely or I had to delay them by several months while I found new data sources for the Reported Fraud List.

19. On November 20, 2023, Middesk sent me a formal letter reminding me of my confidentiality obligations to Middesk from the Proprietary Information and Assignment Agreement I signed with Middesk during my employment and based on the Reseller Agreement. I did not recall when I received this letter that I still had possession of files from my time at Middesk, as I had not opened any of those files since I left Middesk, as I describe below.

20. After months of hard work, Baselayer was able to fill the data gap necessary to adequately launch the Reported Fraud List for our customers. However, this meant that Baselayer now became somewhat of a competitor to Middesk, since both companies now had the identity data set (which came from the same public data sources, such as the secretaries of state, IRS, and USPS databases). Even though Baselayer's Reported Fraud List could be easily differentiated from Middesk's by providing actionable risk and fraud reports for customers, as opposed to Middesk which just provides the identity data set alone, I truly never wanted any outcome where I could be across from Middesk. I am still disheartened today that Middesk breached the Reseller Agreement.

**Middesk's Confidential Information From My Employment At Middesk**

21. I admit that while I was employed at Middesk, I had emailed myself from my Middesk email and downloaded to my personal Google Drive a folder containing Middesk files

(the emails and Google Drive, the "Files"), and I separately downloaded one Middesk PowerPoint deck (the "Middesk Deck"). To the best of my recollection, the Files were related to the customer deals I drove at Middesk from 2021 and 2022. I cannot say for sure what is in these Files because, to my knowledge, I have not accessed, viewed, or touched them since I left Middesk over two years ago, with one exception. There is one document named, "Performance Review…" that, according to my Drive activity, I "edited" on September 8, 2023 (see screenshot below). I do not recall "editing" this document, nor do I recall the specific details of this document, nor have I used it for any Baselayer purposes. I do recall that documents with these titles often include information related to convincing a specific customer to use Middesk's product and the results of a free trial from the customer based on random data the customer would input into the system to test the product. If I am recalling that document correctly, that information would be of no use to Baselayer. First, I "edited" the document when Baselayer was still under the Reseller Contract with Middesk. Further, the information is from years ago, from one customer, and only contains results based on random, manufactured inputs the customer would have entered into Middesk's product to test its results. It would have no information Baselayer could find valuable whatsoever. I have not shared any of the Files with anyone at Baselayer at any time since I downloaded them.



22. I regret emailing myself and downloading these Files, but I have not used or relied on the Files for Baselayer purposes and I have not shared the Files with anyone at Baselayer. From what I can recall, none of these Files would be at all useful to Baselayer because, among other reasons, the information therein is long out of date, Baselayer provides a unique product from Middesk, and customers choose Baselayer because it provides a very different value proposition from Middesk. Further, as a member of the sales team at Middesk, I was never privy to trade secrets, source code, etc., nor would I have understood that information if I was given access to it. I understand that Middesk has alleged that I have emails related to Middesk's lien-search product and industry-classification product. I do not know if I have those emails, since I have not opened my Middesk emails since I left the company. I would presume though, if those files do exist in my emails, that they were non-technical documents that were sent to the entire company so that employees could understand the product and how to sell it – it would not have contained any technical trade secrets, nor would I have understood those if they were included. Indeed, these products, the lien-search product and industry-classification product, are data sets pulled from publicly available sources (e.g. the UCC website). The data sets simply answer the questions of "does this business have a lien on them" or "what industry is the business in." I never even planned for Baselayer to build these products: as a startup company, Baselayer did not have the time or resources to build the identity, lien, and industry data sets, and even if we could, I lacked the technical expertise to do so, and I never shared any of the Files with my team at Baselayer. Instead, Baselayer used other third-party sources for these data sets to initially launch the Reported Fraud List instead of building its own identity, lien, and industry data sets from scratch.

23. I only even realized I had these Files after Middesk's prior attorneys wrote to me in a letter I received on March 3, 2025. After receiving that letter, I conducted a thorough search of my personal accounts (including my Google Drive and emails) and Baselayer accounts (including Google Drive and email). The only Middesk files I located were those I emailed to my personal email account and downloaded in a folder in my personal Google Drive (the Files), a

copy of that same folder on my Baselayer Google Drive which I deleted on March 17, 2025 before this lawsuit was filed, and the single Middesk Deck on my Baselayer laptop. I did not find any other Middesk files on any Baselayer computer or drive.

24. Just like the Middesk folder in my personal Google Drive, to the best of my recollection I did not open the Middesk folder that was on my Baselayer Google Drive, nor did I share it with anyone. The Middesk Deck I located is a deck that Middesk provided to potential investors and the entire company in 2022. In fact, the deck was shared with the entire company during a presentation. As such, my understanding was that the Middesk Deck was not confidential and does not contain any confidential information since it was designed to be shared with people outside of Middesk.

25. I have no interest in any of the information in these Middesk Files or the Middesk Deck and no longer want to possess any of these documents. I will gladly delete all copies of these documents and emails once permitted to do so.

**Baselayer Hires Josh Leviloff**

26. On January 20, 2025, Josh Leviloff contacted me on LinkedIn about an open role at Baselayer. I had never previously met or corresponded with Mr. Leviloff. After Mr. Leviloff contacted me, I met with him on a few occasions and he interviewed with a few others at Baselayer. Thereafter, we decided to hire him. My decision to hire him was in no way based on the fact he specifically worked at Middesk; I hired him because I believed he was a strong salesperson.

27. On February 1, 2025, Mr. Leviloff signed an offer letter with Baselayer.

28. On February 2, 2025, I texted Mr. Leviloff the following, "2 things: -don't sign any termination agreement from them if they offer it (that's where they put the non compete in & offer you money to sign. They offered me shit money) -no need to rush telling mid where you're going right away… the LinkedIn update will be very fun." Mr. Leviloff responded, "Completely aligned! Thanks for the reminders".

29. Baselayer and Middesk are competitors. Mr. Leviloff did not (and does not) have a post-employment noncompete with Middesk. I wanted to make sure that Mr. Leviloff's

employment with Baselayer would not violate any agreement Mr. Leviloff later signed with Middesk. As such, I wanted to remind him not to sign a noncompete with Middesk on his way out the door from Middesk that could put his employment with Baselayer in jeopardy.

30. My comment about Mr. Leviloff's LinkedIn update was meant to be a tongue-in-cheek statement that I did not expect Middesk to be happy to lose an employee to Baselayer. I did not make this comment with the intention for Mr. Leviloff to hide his upcoming employment from Middesk. As reflected in my message, I expected Middesk to find out about Mr. Leviloff's employment when he updated his public LinkedIn. Obviously, that would inform Middesk where he was working.

31. Regretfully, on February 4, 2025, while Mr. Leviloff still was working at Middesk, I texted him and said, "Ask around and validate this with anyone in product before you head out: people litigations = [Court Vendor] and some other source? Criminal history = [Criminal History Vendor] people liens = ? If you feel weird doing that, all good, just lmk. Shouldn't be an issue but I dont mind either way. Just a curious person :)". A true and correct screenshot of this text message exchange is reflected below. While I do not believe that the names of these vendors is confidential and proprietary to Middesk, I do not know if Middesk would consider the name of the vendors at issue to be confidential so in an abundance of caution I have omitted the names from this Declaration and redacted them from the screenshot.



32. I understand now that even though I do not consider the information to be confidential, I should not have sent that text to Mr. Leviloff. When I sent the message, I was

simply curious to know if Middesk still uses the same vendors for sources of data that I was already independently aware of.

33. For instance, at Baselayer, I contacted one of the vendors mentioned in my February 4 text message to Mr. Leviloff, a platform for publicly accessible underwriting data, about potentially contracting for their data set. During our discussions, that vendor informed me that Middesk uses their data set too, in an attempt to convince me to use their data set as well. I understand that this was not proprietary information – Baselayer and Middesk both need this type of data and it's just a fact that each company will need to use one of the vendors in the industry for that data. Baselayer and Middesk are not competing for data sources: a data source can supply both companies, and indeed, in many instances, the same data source will contract with and supply data to both companies. Baselayer does not win business based on the identity of its data sources – customers care about what Baselayer's product does with the data, not where the underlying data comes from (since all of the underlying data is ultimately the same).

34. Generally speaking, the identities of vendors and sources of data sets are not proprietary information in the industry. While I was working at Middesk in selling partnerships, Middesk, as a vendor selling the Identity Data Set, would often require in its reseller agreements that the customers disclose that they use Middesk for their source of information. This was a positive for Middesk – they wanted the advertisement associated with a customer publicly announcing on its website that they source their data from Middesk. The Reseller Agreement between Middesk and Baselayer specifically stated that Middesk granted to Baselayer the right to use and display "the trademarks, service marks, and logos claimed by [Middesk] ('Marks')" and that Baselayer would "market the [Baselayer] Platform and Services only under the Marks." For Middesk to now claim that knowledge of who Middesk itself uses a data source, like the identify of a vendor mentioned in my February 4 text message, is somehow proprietary information is preposterous. Those vendors would have, and could have, required Middesk to disclose this fact, and indeed, one of the vendors mentioned in my February 4 text message told me themselves that they supply data to Middesk. As further proof of how this information is not confidential,

-11-

Middesk's own website advertises the companies for which they are the vendors (https://www.middesk.com/partners). For example, Middesk publicly announces that it is the vendor for Sardine (see screenshot below), but Sardine itself does not publicly disclose they obtain their data from Middesk. For Middesk to now claim that it is proprietary information as to who they themselves use as vendors flies in the face of Middesk's own actions.



35. My intent in the text described in Paragraph 31 above was to communicate that if Mr. Leviloff was not permitted, for any reason, to tell me Middesk's data sources, that was perfectly acceptable and he should not find out or tell me if he was not permitted to. I truly thought I was permitted to seek confirmation on where Middesk sourced their data sets, but if Mr. Leviloff was not allowed to reveal that information, I did not want him to. My instruction to him on that point was sincere and I did not expect Mr. Leviloff to tell me anything he was not supposed to.

36. Mr. Leviloff responded to my text on the same day, saying "Not at all I think that's a completely fair ask, and I plan to".

37. I took Mr. Leviloff's text to mean he was permitted to obtain this information and confirm it. I responded, "Amazing sir ty". Though, as a result of these texts, Mr. Leviloff never provided me with any new information about Middesk's sources of data sets. My understanding was that he did not learn any additional sources of data sets that Middesk used. I did not ask Mr.

Leviloff for this information again. Indeed, Baselayer has in no way used or relied on any information about Middesk's data sources.

38. I never instructed Mr. Leviloff to lie to anyone at Middesk or mislead them about his intentions or conduct. I also never instructed Mr. Leviloff to download any Middesk files or send Baselayer any Middesk files or information. I never received any Middesk files from Mr. Leviloff and do not believe anyone else at Baselayer did either. I also never told him to delete his browser history or to try to hide any of his activities at Middesk.

39. Indeed, I have no knowledge of what Middesk's "Product & Data Partnerships Tracker" is and I certainly did not ask Mr. Leviloff to obtain it. Similarly, I don't know what Middesk's "Model Validation" is and I did not ask Mr. Leviloff to obtain it.

40. On February 24, 2025, Mr. Leviloff started his employment at Baselayer.

41. I understand that the literal next day, on February 25, 2025, Mr. Leviloff updated his LinkedIn account to reflect that he was now working at Baselayer. I never expected that this fact would be hidden from Middesk.

42. On March 3, 2025, I received a letter in the mail from Middesk's attorney notifying me that Middesk was concerned that Mr. Leviloff may have taken Middesk's confidential information when he departed Middesk. In response, that same day, on March 3, 2025, I put Mr. Leviloff on paid leave and took his Baselayer computer back from him. Mr. Leviloff was instructed not to do any work for Baselayer and to not come into the office.

43. To date, Mr. Leviloff has not been permitted to return to work for Baselayer. His access to Baselayer's computer and systems has not been restored.

44. Mr. Leviloff never emailed or texted me any Middesk confidential information.

45. I reviewed the Baselayer computer provided to Mr. Leviloff, the Baselayer email account provided to Mr. Leviloff, and the Baselayer Google Drive that Mr. Leviloff had access to. I have not found any indication that Mr. Leviloff uploaded or shared any Middesk information on his Baselayer computer, through his Baselayer email, or on Baselayer's Google drive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 9, 2025, in New York, New York.

DocuSigned by:

*Jonathan Awad*

F035C27506AC401...

Jonathan Awad