**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Middesk, Inc.**<br><br>　　　　　　　**Plaintiff,**<br><br>　　　　v.<br><br>**Osiris Ratings, Inc. d/b/a Baselayer, and**<br><br>**Jonathan Awad, Timothy Hyde, and**<br><br>**Josh Leviloff,**<br>　　　　　　　**Defendants.** | CIVIL ACTION NO.  1:25-02677  -PKC<br><br>Jury Trial Demanded<br><br>**FIRST AMENDED COMPLAINT** |

**FIRST AMENDED COMPLAINT**
**FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES**

Plaintiff Middesk, Inc. ("Plaintiff," "Middesk," or the "Company"), by and through its undersigned counsel, hereby brings the following First Amended Complaint against Defendants Osiris Ratings, Inc. d/b/a Baselayer ("Baselayer"), Jonathan Awad ("Awad"), Timothy Hyde ("Hyde") and Josh Leviloff ("Leviloff") (collectively "Defendants"), and seeks preliminary injunctive relief, permanent injunctive relief, and monetary damages.

**I.　　PRELIMINARY STATEMENT**

1.　　This case involves the blatant, calculated and deliberate theft of Middesk's confidential information and trade secrets by Awad, the Chief Executive Officer of Baselayer.

2.　　In a sworn declaration submitted to this Court, and confirmatory deposition testimony, a former Middesk employee stated under penalty of perjury:

> Awad told me over the phone that he would pay me a significant sum of money (it was either $10,000 or $20,000 but I don't remember the exact figure) if I sent him a list of Middesk's prospects and customers from Salesforce.

1

3.    Following Awad's instruction, the Middesk employee, Leviloff, combed through Middesk's password-protected systems, gathering the sensitive information he was directed to steal concerning Middesk's customers, prospective customers, confidential pricing, strategic vendors, and more.  Shortly thereafter, Leviloff left his employment at Middesk, joined Baselayer as an employee, and shared the Middesk information with Awad and Baselayer.

4.    Further, after Leviloff started working at Baselayer, Awad and Hyde, Baselayer's Co-Founder and CTO, directed Leviloff to disclose confidential information and trade secrets related to Middesk's product design.

5.    Computer forensics, forced admissions from Defendants, and testimony from Leviloff confirm that this scheme started long before Awad recruited Leviloff.  Evidence has come to light that, Awad—who previously worked at Middesk before founding Baselayer—improperly stole thousands of pages of Middesk documents containing confidential information and trade secrets upon his departure from Middesk in 2023.

6.    The recent conduct related to Leviloff is just the tip of the iceberg revealing Baselayer's wrongdoing.  Awad's improper use of stolen Middesk trade secrets dates back to Baselayer's founding, and those stolen Middesk trade secrets were instrumental to Baselayer's fundraising and customer acquisition.

7.    Middesk is a data platform that modernizes business verification.  Its Application Programming Interfaces ("APIs") deliver data solutions that enable companies to perform fast, frictionless business verifications, risk evaluations, and compliance checks, including know-your-business ("KYB") services, credit assessments, and tax registration services.  More than 500 customers in the fintech, banking, lending, marketplace, insurance, and payroll sectors trust Middesk to help them safely verify and underwrite their small or medium-sized customers.

8.      Awad worked at Middesk from June 2021 through January 17, 2023.  Shortly thereafter, Awad and Hyde launched Baselayer, which offers products and services competitive to Middesk's products and services.  Awad and Hyde did this while in improper possession of thousands of pages of Middesk documents, including Middesk's confidential, proprietary and trade secret information.  Middesk recently discovered that while Awad was still employed by Middesk, he misappropriated Middesk's confidential and proprietary information by emailing documents from his work laptop to his personal email address and by secreting out documents via other means.  This was done in violation of the Proprietary Information and Inventions Agreement that Awad executed as a condition of his employment with Middesk (the "Awad Agreement," attached hereto as **Exhibit A**).  Awad did not simply take a few Middesk items by mistake.  Rather, Awad had well organized folders in his personal Google Drive and on Baselayer's corporate Google Drive, **each containing one thousand nine hundred and ninety-one sensitive Middesk documents or sub-folders**.  Awad was proud of this fact, and he boasted to Baselayer employees about how much information he stole when he left Middesk.

9.      Upon information and belief, Awad and Hyde obtained and secured funding and customers for Baselayer by leveraging Middesk's confidential and proprietary information, and trade secrets.

10.     **Awad, Hyde, and Baselayer have now been caught red-handed concerning conduct as recent as February 2025.**

11.     Awad and Hyde knowingly and deliberately enlisted Leviloff, a then-current Middesk employee, to steal and/or disclose Middesk's confidential and proprietary information and trade secrets for Awad, Hyde, and Baselayer's benefit.  This included sensitive and confidential pricing information, product pipeline plans, and other trade secrets.

12.    Specifically, in early 2025, Awad met with Leviloff, then a Middesk Account Executive, and offered him a role at Baselayer.  After Leviloff accepted a job offer from Baselayer, but while he was still employed and paid by Middesk, Awad **personally directed** Leviloff to keep quiet about the fact that he was joining Baselayer so that he would not lose access to Middesk's protected systems during his two-week notice period.  Awad, with Hyde present in at least one instance, also **personally directed** Leviloff to relay certain Middesk confidential and proprietary information to Awad and Baselayer, even going so far as to offer the Account Executive $10,000 to $20,000 for a list of Middesk's customers.

13.    Leviloff obtained access to the Middesk information that Awad and Hyde instructed him to collect for Baselayer's benefit by using his password-protected access to various Middesk platforms.  In instances where he did not have access to the information, Leviloff requested the information from other people at Middesk, lying about the reasons for his request.  The files accessed by Leviloff at Awad's instruction include highly sensitive information about Middesk's internal business operations and key data providers that power Middesk's products and services.  To be clear, computer forensics, and Leviloff himself, have confirmed that Leviloff accessed and copied Middesk information *after* he executed an employment agreement with Baselayer on February 1, 2025, but while he was still being paid and employed by Middesk throughout February 2025.

14.    To minimize their chances of being caught, instead of downloading files from Middesk's password protected systems and transferring them to Awad and Baselayer, Leviloff wrote down the information that Awad and Hyde asked him to obtain in a notebook.  On or around February 24, 2025, Leviloff officially started working at Baselayer, and he provided Awad with

the notebook containing Middesk's confidential and trade secret information and verbally relayed to Awad the information requested.

15. Awad, Hyde, and Baselayer, aided by Leviloff, have exposed Middesk to significant harm. Middesk is only beginning to understand the full extent of the damage caused by Leviloff's unlawful acts and by Awad and Baselayer's earlier theft of Middesk documents. Moreover, Awad and Baselayer are improperly trying to prevent Middesk from getting to the truth. For example, *after* receiving a letter from Middesk's lawyers notifying Awad and Baselayer of their duty to preserve evidence, Awad went onto Baselayer's Google Drive and deleted a folder containing nearly two thousand Middesk files that he had stolen, making it difficult (and potentially impossible) for Middesk to ascertain how this Middesk information has been used by Baselayer.

16. Awad, Hyde, and Baselayer are desperate to unlawfully leverage Middesk's confidential and trade secret information to unfairly compete with Middesk, to replicate Middesk's product and service offerings, and to hide evidence of their wrongdoing.

17. Middesk welcomes fair competition because it drives Middesk to innovate and create better solutions for its customers. However, what Baselayer, Awad, and Hyde have done (both directly and indirectly through Leviloff) is not competition at all: it is theft. Defendants unlawfully took Middesk's highly sensitive confidential information. Upon information and belief, Awad, Hyde, and Baselayer have used, and are still using this ill-begotten information to unfairly compete with and cause harm to Middesk. This lawsuit seeks to hold Defendants accountable for their misconduct, recover and uncover what was stolen, enforce Middesk's rights in contract and in law, and stop the ongoing misuses of Middesk's confidential and proprietary information and trade secrets.

## II.    JURISDICTION

18.    This Court maintains subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Middesk asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1833 (the "DTSA").

19.    This Court has supplemental jurisdiction over Middesk's pendent state law claims under 28 U.S.C. § 1367.    These pendent state law claims derive from a common nucleus of operative facts and are so related to the federal law claims that they form part of the same case or controversy.

## III.    THE PARTIES

20.    Plaintiff Middesk, Inc. is a Delaware corporation with its principal place of business located at 85 2nd St, Suite 710, San Francisco, CA 94105.

21.    Upon information and belief, Defendant Osiris Ratings, Inc. d/b/a Baselayer is a Delaware corporation with its principal place of business located at 445 Grand Street, Brooklyn, NY, 11211.  Baselayer touts itself as a New York City based start-up and has numerous employees, including Awad working and living in New York.  Baselayer transacts business within the State of New York and has contracts to supply services in the State of New York.  The conduct related to this action conducted by Baselayer occurred primarily in New York, New York.

22.    Upon information and belief, Defendant Jonathan Awad is a citizen of the United States and resides at 445 Grand Street, Brooklyn, NY, 11211.  The conduct related to this action conducted by Awad occurred partially or primarily in New York, New York.

23.    Upon information and belief, Defendant Timothy Hyde is a citizen of the United States and resides in San Francisco, CA, and owns or rents the property at 445 Grand Street, Brooklyn, NY, 11211, where Baselayer has its offices.  The conduct related to this action

conducted by Hyde, or carried out on Hyde's behalf, occurred partially or primarily in New York, New York.

24.    Upon information and belief, Defendant Josh Leviloff is a citizen of the United States and resides at 214 East 88th Street, Apartment 4d, New York, NY 10128.  The conduct related to this action conducted by Leviloff occurred partially or primarily in New York, New York.

## IV.    FACTUAL ALLEGATIONS

### A.    Middesk

25.    Incorporated in 2018, Middesk is a leading data provider of business verification, credit assessment, and entity management products.  Among other services, Middesk helps its customers verify the legitimacy, health, and history of small businesses. Middesk provides these services through proprietary tools that efficiently and accurately search, synthesize, and analyze massive volumes of data.

26.    Middesk has invested substantial resources, both financially and in human capital, to develop the trade secrets and other confidential and proprietary information stolen and misappropriated by Defendants.

27.    It has taken Middesk multiple years, thousands of people hours, and millions of dollars to build out the data infrastructure, vendor relationships, and technology that powers Middesk's products and that have helped Middesk to become a market leader.  The information that Awad and Baselayer directed Leviloff to obtain—information about which data providers Middesk uses for certain products—serves as an illustrative example.  This non-public data would otherwise be very difficult for competitors and new entrants to the market to learn.  Middesk employs a comprehensive, data-driven methodology to evaluate and select optimal data vendors for each of its products.  This selection process incorporates proprietary data accumulated over

multiple years, which Middesk leverages to refine its product partner selection, differentiate its products in the market, and optimize service delivery to customers. Through strategic, long-term vendor relationships, Middesk has developed exclusive, non-public data solutions that address its customer challenges in innovative ways. Further, Middesk has made substantial investments in securing preferential commercial terms and pricing structures with these data partners, creating significant competitive advantages and adding value for its customers.

28.     The Middesk trade secrets misappropriated by Defendants were and are used in interstate commerce as Middesk has clients and operations throughout the United States.

**B.     Middesk Confidentiality Policies and Protection of Confidential Information**

29.     Middesk takes a number of steps to protect the confidentiality of its information including: (1) requiring employees with access to Middesk confidential and proprietary information and trade secrets to execute Proprietary Information and Inventions Agreements (like the ones that both Leviloff and Awad executed); (2) maintaining policies that forbid employees from disseminating Middesk confidential, proprietary, trade secret information and disseminating those policies to all employees through the Employee Handbook, which both Awad and Leviloff signed; (3) implementing electronic security measures such as use of passwords, two-factor authentication, security timeouts on computers and cellular phones, disabling removable media on company computers, and segregating confidential information; (4) limiting the Middesk employees who have access to the Company's confidential information; and (5) requiring Middesk employees, including Leviloff, to attend cyber security training.

**C.     Awad's Employment at Middesk**

30.     From approximately June 7, 2021, to January 17, 2023, Middesk employed Awad. Awad was first employed as an Account Executive and then later as a Partnerships Manager.

31.     In his capacity as an Account Executive, Awad focused on identifying, engaging, and closing net-new customers who could benefit from Middesk's solutions.  As a Partnerships Manager, Awad managed established relationships to enable Middesk's partners' success and increase distribution and adoption.

32.     During his employment, Awad was provided access to Middesk's confidential and proprietary information, including sensitive pricing information, product and company strategy, competitive intelligence, target customer and account lists, pipeline plans, and more.

33.     As a condition of Awad's employment, and due to his access to Middesk's trade secrets and confidential and proprietary information, Middesk required Awad to execute a Proprietary Information and Inventions Agreement (the "Awad Agreement") on May 28, 2021. *See* **Exhibit A**.

34.     In Section 4 of the Awad Agreement, Awad promised to "hold in confidence and not disclose or, except within the scope [of his employment] use any Proprietary Information." Awad also promised to return any Middesk proprietary information upon the termination of his employment.

35.     Middesk would not have afforded Awad access to the Company's confidential, proprietary, and trade secret information had he not agreed to be bound by the terms in the Awad Agreement.

36.     Through Middesk's recent investigation, computer forensics, and early discovery, evidence has come to light showing that Awad knowingly breached the terms of the Awad Agreement, and that Awad, Hyde, and Baselayer are in possession of nearly two thousand Middesk documents, containing confidential, proprietary, and trade secret information.

**D.    Awad Steals Middesk's Confidential, Proprietary and Trade Secret Information Via Email**

37.    Beginning in or around October 2022 and continuing until the end of his employment in January 2023, Awad frequently used his Middesk email address to forward confidential, proprietary, and trade secret information about Middesk's business to his personal email address.  These documents included proprietary and trade secret information belonging to Middesk, including, but not limited to:

(a)    an internal email discussing Middesk's internal pricing and product strategy for its lien search product;

(b)    an internal email discussing Middesk's launch plan and product roadmap for an industry classification product that was in beta at the time;

(c)    an internal email explaining Middesk's approach to high-level product strategy and future growth; and,

(d)    two spreadsheets that Middesk purchased to build out its marketing platform, containing the names and contact information of hundreds of potential customers who would likely need the types of services that Middesk provides.

38.    All the documents listed above, as well as others that Awad emailed himself while working for Middesk, are not generally known by competitors and could be used to unfairly compete with Middesk.

39.    Upon information and belief, Awad accessed and used these documents while building a competitive business, Baselayer.  For example, Baselayer has launched a lien-search product similar to the product outlined in an internal email that Awad stole, and upon information and belief, Baselayer has built a similar industry-classification product that resembles the product outlined in an internal Middesk email that Awad emailed to himself without authorization.

40.    Awad admits to having using his Middesk work email to send Middesk property to his personal email.

41.    The beginnings of Awad's plan to steal Middesk trade secrets and confidential information and use to that information to launch a competitive company may date back to as early as March 2022, while he was still working at Middesk.

42.    In or around March 2022, Awad texted a friend "I found our CTO"

43.    In this text, Awad is referring to Tim Hyde.

44.    On or around March 14, 2022 Awad sent a message to Hyde stating "Hey Tim! Do you have that list of things top of mind for you ahead of committing to becoming CTO & co founder of **Pricing Desk?** Would be great to get it before the end of this week so we can get to tackling it as a team."

45.    Upon information and belief, "Pricing Desk" was the original name of the company that would eventually evolve and become Baselayer, a direct competitor to Middesk.

46.    It is clear from initial computer forensics that Awad was actively working on creating and launching "Pricing Desk" while still working for, and getting paid by, Middesk.

47.    Further, text communications from Awad around this time make clear that he wanted to get fired from Middesk so that he could collect severance, and that he was hoping to get fired so that he didn't have to quit.

48.    By way of example, on January 14, 2023, Awad texted a friend "Lowkey I want get fired vs quit because then I get severance" and "if I quit I get nothing."

E.    **Awad Steals Middesk's Confidential, Proprietary and Trade Secret Information Via Other Means**

49.    Awad has now been forced to admit that while employed by Middesk he downloaded a folder of Middesk files.  Awad stored this folder of Middesk documents on his

11

personal Google Drive (herein "Folder 1") and copied the contents into a folder on Baselayer's corporate Google Drive (herein "Folder 2").

50.     It is not yet clear what methods Awad used to download the documents contained in Folder 1 and Folder 2, however, it is clear that: (a) Awad was not authorized to have these documents; and, (b) they have been in his possession since Awad left Middesk.

51.     Because Folder 2 was on Baselayer's corporate Google Drive, Awad, Hyde, and other Baselayer employees had access to Folder 2 and its contents, presumably for a number of years.

52.     *After* receiving a letter from Middesk's lawyers notifying him of his obligation to preserve evidence, Awad **deleted** Folder 2 from the Baselayer google-drive.  This spoliation has impeded Middesk's investigation into how its property was being used and who had access to it. Upon information and belief, Awad deleted the Middesk folder from the Baselayer drive in an attempt to willfully destroy evidence important to this case because he knew how bad it looked.

53.     Awad claims that he didn't realize he had the Middesk files in Folder 1 and Folder 2 until he received a letter from Middesk's attorneys on March 3, 2025.  Further, Awad claims the files were "inadvertently retained when he left Middesk".  These claims, however, strain credulity. First, Awad admits he copied these documents from his personal Google Drive onto the Baselayer Google Drive, which is a deliberate act, not an "inadvertent" act.  Second, on multiple occasions in the days leading up to March 3, 2025, — the day on which Awad claims he suddenly remembered he had Middesk documents in his possession — Awad boasted that when he left Middesk he took "everything" with him, including Salesforce Reports (i.e., customer lists) and details of how Middesk's product was built.  Third, Awad deleted Folder 2 after receiving a preservation notice from Middesk.  In other words, contrary to Awad's claim that he did not

12

remember he had these Middesk documents, it appears that: (a) he knew these documents would be useful to Baselayer, which is why he copied them from his personal Google Drive to the Baselayer Google Drive; (b) he was well aware he had these documents, as it's not really possible to brag about something you don't remember; and, (c) as soon as he realized he might have been caught, he was in a rush to destroy evidence of how the Baselayer team accessed and leveraged these documents.

54.     While Awad's spoliation has prevented Middesk from seeing the contents of Folder 2, Awad and Baselayer have produced Folder 1 in discovery.  Folder 1 contains **one thousand nine hundred and ninety-one** Middesk files and folders.  All of the contents of Folder 1 are Middesk property, and much of it is proprietary and trade secret information, including, but not limited to:

(a)     Product roadmaps;

(b)     Notes from Middesk's CEO, listing Middesk's partners, how Middesk works with each partner, mutual customers that Middesk and each partner were selling to, and the stakeholders that Middesk worked with at each partner;

(c)     Notes from Middesk's CEO and other Middesk employees discussing Middesk customers and prospects;

(d)     Middesk's marketing strategy;

(e)     Middesk's product strategy and product roadmap;

(f)     Middesk's revenue numbers, revenue roadmaps, and other growth-related internal strategy information;

(g)     Confidential customer pricing information; and,

(h)     Confidential product information which could be used to reverse engineer Middesk's products.

55.     All the documents and information listed above, as well as others possessed by Awad and Baselayer in the Middesk Folders, are not generally known by competitors and could be used to unfairly compete with Middesk.

56.     According to Awad, the deleted Folder 2 was a copy of Folder 1, and thus all the documents above were stored on Baselayer's corporate Google Drive and, upon information and belief, accessible to Baselayer employees.  Upon information and belief, Awad, Hyde, and other Baselayer employees accessed and used these documents while building a competitive business, Baselayer.

**F.      Awad Launches Baselayer**

57.     Less than one month after his termination from Middesk, Awad incorporated the entity that later became Baselayer.  The Middesk proprietary and trade secret information that Awad secreted out of Middesk was directly applicable to Awad's new competing venture: a business deliberately positioned to encroach upon Middesk's established market space.

58.     According to Baselayer's website, Baselayer "equips businesses with fully automated solutions for KYB, Risk, and Fraud management" and offers products to address tax identification number ("TIN") matching, business name matching, business address matching, business officer matching, officer and registered agent verification, sanctions screening, industry matching, lien search, and litigation history search.  These are **all** services that Middesk provides.

59.     According to Awad's public LinkedIn profile, as of early March 2025, Baselayer had raised over $20,000,000 in funding.

60.     In addition to apparently leveraging the confidential and proprietary information that he took from Middesk to build Baselayer's business, Awad has attempted to improperly

14

compete with the Company in other ways.  By way of example, Awad has contacted Middesk employees he worked with to fish for information about Middesk's pricing, products, and business plans.  In addition, multiple Middesk customers have informed Middesk that Awad has touted his insider knowledge of Middesk's confidential pricing as part of Baselayer's attempts to poach Middesk customers, which indicates that Awad was leveraging the information and documents that he stole from Middesk.

### G.    Leviloff's Employment with Middesk

61.    From July 2023 to February 21, 2025, Middesk employed Leviloff as an Account Executive.

62.    In his capacity as an Account Executive, Leviloff was focused on identifying, engaging, and closing net-new customers who could benefit from Middesk's solutions, as well as expanding existing customers, identifying ways to grow their business, and supporting bringing new products to market.

63.    As a condition of Leviloff's employment, and due to Leviloff's access to Middesk's trade secrets and confidential and proprietary information, Middesk required Leviloff to execute a Proprietary Information and Inventions Agreement (the "Leviloff Agreement").  Leviloff executed the Leviloff Agreement on July 15, 2023. *See*, **Exhibit B**.

64.    In Section 4 of the Leviloff Agreement, Leviloff promised to "hold in confidence and not disclose or, except within the scope [of his employment] use any Proprietary Information." Further, Leviloff promised to return all items containing Middesk's proprietary information upon the termination of his employment.

65.    In Section 6 of the Leviloff Agreement, Leviloff promised that "during the term of [his] employment with Company (whether or not during business hours), [he would not] engage in any activity that is in any way competitive with the business or demonstrably anticipated

business of Company, and…not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company."

66.    Middesk would not have afforded Leviloff access to the confidential, proprietary information, and trade secrets had Leviloff not agreed to be bound by the terms in the Leviloff Agreement.

67.    Leviloff has breached the terms of the Leviloff Agreement through the actions described in this Complaint.

**H.    Awad Directs Leviloff to Breach His Contractual and Common Law Obligations to Middesk, Instructs Him to Keep Quiet, and Offers Thousands of Dollars for Specific Information**

68.    Computer forensics and Leviloff himself, have confirmed that, as of January 22, 2025, Awad and Leviloff had extensive communications about Leviloff leaving Middesk to join Baselayer.

69.    **By no later than February 1, 2025, Leviloff had executed an employment contract with Baselayer.** Leviloff however did not resign from Middesk on this date or inform Middesk he was going to work for a competitor, instead he began working as an agent for Baselayer and undertaking tasks for Baselayer's benefit.

70.    On February 2, 2025, Awad instructed Leviloff not to sign a termination agreement with Middesk and told him that there was "no need to rush telling [Middesk] where you're going right away… the LinkedIn update will be very fun." Awad claims this was just a "tongue-in-cheek" statement, not meant to be taken too seriously. However, this claim is not supported by the record, because after sending these instructions via text, Awad reiterated this message to Leviloff either over the phone or in person.

71.    Upon information and belief, Awad instructed Leviloff not to tell anyone he was going to Baselayer because he knew that if Middesk found out, Leviloff's access to Middesk's

systems would be restricted, making it harder for Leviloff to steal confidential and trade secret information during his final days there.

72. On or around February 4, 2025—while Leviloff was still employed by Middesk—Awad began directing Leviloff via text message and multiple phone calls on what Middesk confidential and trade secret information he wanted Leviloff to gather.

**(a)** **Awad Instructs Leviloff on What Middesk Trade Secrets and Confidential Information To Gather During His Two-Week's Notice Period – Customers and Prospects.**

73. Awad offered Leviloff $10,000 to $20,000 if Leviloff would send Awad a list of Middesk's prospects and customers from Salesforce. Awad asked Leviloff to obtain this list after Leviloff had signed an offer letter with Baselayer and before Leviloff had left his employment at Middesk. A list of Middesk customers and prospects is confidential and trade secret information that would be highly valuable to Baselayer.

74. Leviloff did not send Awad a direct export from Middesk's salesforce, however, he did the next best thing and copied all the information that Awad was asking for into a notebook.

**(b)** **Awad Instructs Leviloff on What Middesk Trade Secrets and Confidential Information To Gather During His Two-Week's Notice Period – Data Providers.**

75. On or around February 4, 2025—while Leviloff was still employed by Middesk—Awad began directing Leviloff via text message and multiple phone calls to access and share Middesk's confidential and proprietary data provider information with Awad and Baselayer.

76. In the text message, Awad listed services that Middesk provides to customers and directed Leviloff to determine what vendors or data providers Middesk uses in providing those services. Specifically, Awad directed Leviloff to "Ask around and validate this [list] with anyone

17

in [Middesk] product before you head out." Awad followed up over the phone to reiterate this request.

77.    Leviloff responded that he planned to ask for the information.

78.    All the services that Awad instructed Leviloff to investigate at Middesk are services that Baselayer also provides in competition with Middesk. This information would be of significant value to a competitor like Baselayer and disclosing this information would cause substantial harm to Middesk.

79.    On February 10, 2025, Leviloff did as directed and reached out to Middesk's Product Partnerships Lead and asked for a "source of truth for the data vendors on **all of [Middesk's] products.**" Middesk's Product Partnerships Lead maintained this information in a confidential spreadsheet titled Product & Data Partnerships Tracker. This document contained everything that Awad had directed Leviloff to gather and more. Specifically, the Product & Data Partnerships Tracker lists: (a) all of Middesk's product and data vendors; (b) what each vendor manages for Middesk; (c) what products Middesk purchased from each vendor; and (d) internal notes, including potential future negotiation strategies with specific vendors.

80.    At this point in time, fewer than five people at Middesk had access to the Product & Data Partnerships Tracker, and all of them needed access for operational purposes or to contribute to the document. Leviloff did not have access. As such, the Product Partnerships Lead directly asked Leviloff to verify that he needed the information for a legitimate use.

81.    When the Product Partnerships Lead asked Leviloff why he needed the document and whether it was for "internal use or something else," Leviloff lied. He fabricated a backstory so he could get the information he was directed to find for Awad and Baselayer. Leviloff did not disclose he was seeking to pass on this information to his new employer and a direct Middesk

18

competitor, but instead told the Product Partnerships Lead that he was working on some "nuts and bolts questions." When the Product Partnerships Lead asked Leviloff if this was for internal Middesk use, Leviloff lied again and said, "yeah … even though we dont [sic] share this externally its [sic] helpful to know how things work to have confidence in presenting to clients." In other words, Leviloff confirmed that he knew the Tracker was confidential and not meant to be shared outside the Company.

82.     Leviloff did not send the Tracker to Awad or Baselayer because he wanted to minimize his electronic footprint, and because the document was marked "CONFIDENTIAL". However, Leviloff copied the information from the Tracker into his notebook, and later relayed the information to Awad and Baselayer.

83.     Upon information and belief, Awad and Baselayer have gained access to the information within the Product & Data Partnerships Tracker and are using that information to compete with Middesk.

84.     Awad knew that Leviloff was employed by Middesk when he explicitly directed Leviloff to access the Company's confidential and proprietary information. Upon information and belief, Awad was also aware that Leviloff was bound by the confidentiality provisions contained in the Leviloff Agreement and that Leviloff's conduct in accessing Middesk's information on behalf of Baselayer would breach that agreement. Specifically, based on Awad's experience as a Middesk employee, he would be aware that Middesk requires its employees to execute confidentiality agreements and that Middesk treats as confidential the type of information that Awad asked Leviloff to share.

85.     On February 11, 2025, just one day after obtaining access to the information Awad had directed him to uncover, Leviloff informed Middesk that he would be resigning and that his

19

last day would be February 21, 2025. Leviloff was allowed to continue working for Middesk because he informed his manager that he had been accepted into a Master of Business Administration ("MBA") program, and that he was resigning because he intended to go back to school in the Fall of 20205. At the time, Leviloff did not disclose to Middesk that he had in fact been in conversation with Awad and that he intended to work at Baselayer.

**(c)    Awad and Hyde Prod Leviloff for Information About Middesk's Product Performance Instructs Leviloff on What Middesk Trade Secrets and Confidential Information To Gather During His Two-Week's Notice Period – Data Providers.**

86.    After Leviloff began working at Baselayer, Awad and Hyde asked him to provide information related to Middesk's product performance.

87.    Leviloff had included information related to Middesk's product performance in the notebook. In addition, on or around February 19, 2025, logs for the Middesk's Google Workplace account, a secure password-protected cloud computing document and email platform, show that Leviloff accessed and downloaded a file titled "Middesk Model Validation." Preliminary computer forensics indicate that Leviloff performed this download using a device that was not issued by the Company and instead was either a Baselayer or personal device.

88.    The Middesk Model Validation document outlines Middesk's approach to developing models for matching the names of people and companies against global sanctions lists and ensuring that the returned results meet the quality and performance expectations of enterprise financial service firms and the federal regulators with whom those people and companies work. The Middesk Model Validation document represents a significant investment of time and money by Middesk. Middesk worked with an external firm to develop, validate, and test various solutions to developing this model in a way that would support their compliance programs. The strategy outlined in the Middesk Model Validation document is a technology differentiator for Middesk

and plays a fundamental role in ensuring high quality and high integrity results from Middesk. The information in this document would be very valuable to a competitor, as evidenced by, among other things, the fact that Middesk only shares the document with customers who have executed NDAs.

89.    Upon information and belief, Awad and Baselayer have gained access to the information in the Middesk Model Validation and are using, or are planning to use, that information to compete with Middesk.

90.    Middesk's access logs also show suspicious patterns in the internal documents that Leviloff was accessing, starting at the same time Leviloff and Awad began discussing Leviloff joining Baselayer.  For example, there are numerous confidential documents that Leviloff had not accessed a single time in his year and a half working at Middesk but that, in his last few weeks, he accessed dozens of times.  Many of these documents outline the inner workings of Middesk products, business strategy, and go to market plans.  Upon information and belief, Leviloff accessed these documents at Awad's and Baselayer's direction, and/or with the intention of sharing them with Awad and Baselayer.

        **(d)**        **Leviloff accesses and obtains sensitive data from Salesforce without a valid business purpose.**

91.    Further, ***after Leviloff had executed an employment contract with Baselayer in February 2025***, including late on his last day employed at Middesk, Leviloff's account was used to access Middesk's Salesforce portal.  Salesforce is a password-protected database that contains highly confidential sales information, including pricing, and summaries of discussions with key customer contacts.  Middesk employees are not permitted to share Salesforce passwords with third-parties.

92.    Leviloff texted Awad on February 1, 2024 that he signed his employment contract with Baselayer.  Leviloff added that he was "going to be in [V]ail with [his] girlfriend and her family this week, so [] might be slow to respond but I'm absolutely PSYCHED."

93.    But Leviloff continued accessing Middesk's Salesforce portal while on vacation. On February 3 and 4, 2025 he successfully logged in to Salesforce from Avon, Colorado, a short distance from Vail.

94.    Over the next approximately two weeks, Leviloff continued to sign into Salesforce in Ashburn, Virginia; Boardman, Oregon; and most frequently from New York, New York.  He accessed Salesforce a number of times from his phone and a Baselayer or personal device.  During this time, Leviloff did not inform Middesk he had executed a contract with Baselayer.

95.    Without access to the devices and cloud storage used by Leviloff, Middesk cannot ascertain the extent of the Company's information that he misappropriated and how he may have used or shared it.

(e)    **Leviloff attempts to cover his tracks while maintaining access to confidential Middesk data on his personal device.**

96.    Leviloff's last day of employment with Middesk was February 21, 2025.  On February 21, 2025, at 12:56 pm, Leviloff deliberately cleared the internet browser history on his Middesk provided laptop and accessed a link with the title "Delete your Google Account" to delete his Middesk Google account and its associated user history.

97.    However, as late as February 21, 2025, Leviloff continued to access Middesk's Salesforce portal from his personal iPhone.  **There was no legitimate business reason for Leviloff to access Salesforce on this last date of employment.**  Any evidence of Leviloff's activity, including report access, downloads, and subsequent transmission or screenshotting, would

be stored on Leviloff's personal iPhone, any Baselayer device issued to Leviloff, and/or cloud storage.

98.    Even more concerning, Middesk has discovered evidence that Leviloff used a personal email account with the ability to access an Apple iCloud feature to synchronize data between a device and cloud storage.  Preliminary computer forensics indicates that Leviloff enabled an Apple iCloud Drive while using his work computer.  This means that Leviloff may have used Apple iCloud Drive to access and save Middesk's trade secrets onto a Baselayer device or personal device on his last day of employment.

99.    Forensic analysis has also confirmed that on February 20, 2025, the day before his last day of employment, Leviloff synchronized (and therefore copied) 38 files from Middesk's password-protected Google Drive.  This is particularly concerning because there is no evidence that any of these files were copied to Leviloff's Middesk laptop.  In other words, Leviloff copied these files onto a Baselayer device or personal device.

100.    Leviloff had not accessed some of these documents for over a month before his termination.  The documents included confidential and sensitive trade secrets.  For example, some of these documents contain pricing and volume pricing information for all Middesk's products and an internal model that Middesk built to help with sales and explain the value of Middesk's products.  Some of the accessed documents outline feedback that Middesk has received on its products, something that Leviloff would have had no legitimate business use for in his final days of employment.

101.    The confidential Company information accessed on Leviloff's personal device or Baselayer devices could be exploited by Baselayer to compete unfairly with Middesk.  For example, the information would give Baselayer insight into exactly what Middesk charges its

23

customers, who at each customer oversees purchasing, when a relevant customer's contract with Middesk is expiring, and how to pitch competing products to Middesk customers.

102.    Additionally, it has come to light that Baselayer is now directly competing with Middesk on deals and customer pitches for which Leviloff was the lead sales resource at Middesk.

I.    **Awad Engages In Deliberate Spoliation.**

103.    On March 3, 2025 Awad received a cease and desist from Middesk, attached hereto as **Exhibit C**.  There is no doubt that Awad read this letter, as he admits to it and Leviloff saw him read it and then took some time to process it.  This letter was unambiguous when it came to preservation.  It said:

> this letter places Baselayer on notice of its obligation to preserve and maintain in a discoverable format, and refrain from destroying, altering, transferring, or rendering unavailable, any and all documents or information, in any form or media (including but not limited to any electronically stored information on any computer or other device capable of storing information), that may relate in any way to Baselayer's hiring of Mr. Leviloff, and to Middesk's trade secrets, proprietary or confidential information, and use or disclosure of same. The obligation to retain documents and information includes the obligation to discontinue all data destruction and data recycling practices. If Baselayer has not taken steps necessary to preserve relevant evidence, this letter is intended to serve as a preservation letter with respect to all relevant documents, materials, and information, in any form. **Any failure to preserve documents or information could lead to the imposition of sanctions or monetary penalties by a court or an arbitrator in the event of litigation, including, without limitation, a presumption that such materials would have been damaging to your defense.**

**Exhibit C** (emphasis in original).

104.    After Awad read this letter, Awad and Leviloff discussed what it could mean. Awad told Leviloff not to worry, and that Baselayer would have his back.  When Leviloff asked about the notebook, Awad said "what notebook? It never existed." At this point, Awad was aware that Leviloff had retained counsel, and as far as the notebook was concerned, Awad told Leviloff "you can tell your lawyers about it, or not."

24

105. Awad admitted that *after* this point, on March 17, 2025 he deleted Folder 2 from the Baselayer Google Drive.

106. The forensics on Folder 1, which was on Awad's personal Google Drive and was not deleted by Awad show when each Middesk file was last accessed and/or edited, and by whom. If Awad had not deleted Folder 2, forensic evidence would have been able to show who at Baselayer was accessing Middesk's documents on the Baselayer drive and when. Upon information and belief, Awad deleted Folder 2 from the Baselayer Google Drive in order to hide evidence of use that would by Baselayer and its employees.

**J.    Middesk Will Be Harmed if the Court Does Not Prevent Further Breaches of Defendants' Agreements and Defendants' Use of Middesk Confidential and Proprietary Information and Trade Secrets.**

107. Middesk has developed its trade secrets and confidential information through great effort, cost and expense. If Defendants are not enjoined from their misappropriation, Middesk will suffer severe and irreparable harm.

108. Through Middesk's recent investigation and computer forensics, Middesk has caught Awad red-handed, deliberately and unlawfully directing a then-current Middesk employee to breach his contractual obligations to Middesk by obtaining confidential and trade secret information for Baselayer's benefit. *See* Declaration of Julian Ackert, which is attached hereto as **Exhibit D**.

109. This was not the conduct of a "rogue" Baselayer employee. Awad is the Chief Executive Officer Baselayer, Hyde is the Chief Technology Officer of Baselayer, and together they are Baselayer's co-founders

110. Middesk's investigation to date has further revealed that Awad took nearly two thousand files containing proprietary and confidential information about Middesk's business and stored them on Baselayer devices. Upon information and belief, Awad then used that information

25

to build Baselayer's business and raise tens of millions of dollars in venture capital to directly compete with Middesk.  Then Awad instructed Leviloff—who had just signed an agreement to work for Baselayer and would remain a Middesk employee with access to information for a number of weeks—to steal and share information related to Middesk's customers, pricing, and data sources and data partnerships, part of the life blood of businesses in this space.  The forensics performed to date is specific, concrete, and dispositive of these facts.

111.    As a result of Defendants' theft, they are unlawfully in possession of Middesk's confidential and proprietary information and trade secrets.

112.    To protect its interests, Middesk initiated this action to prevent it from suffering from additional irreparable harm and other damages through Defendants' conduct and to put an end to this pattern of behavior.

**COUNT I**
**Breach of Contract**
**(Against Defendant Leviloff)**

113.    The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

114.    Leviloff continues to be bound by the Leviloff Agreement, which is an enforceable contract between Leviloff and Middesk, and which is attached hereto as **Exhibit A**.

115.    Leviloff's Agreement provides that Leviloff 1) will use confidential and proprietary information only for the Company's purposes; and 2) will not engage in any conduct supporting a directly competitive business while employed by Middesk.

116.    Middesk's investigation to date has revealed that Leviloff, at the direction of the Awad, accessed confidential, proprietary, and trade secret information for the purpose of sharing such information with Awad and Baselayer.

117.    Upon information and belief, Leviloff is using this information or intends on using this information for the benefit of Baselayer.

118.    Leviloff's actions are in violation of the Leviloff Agreement.

119.    Middesk has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT II
## Breach of Contract
### (Against Defendant Awad)

120.    The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

121.    Awad continues to be bound by the Awad Agreement, which is an enforceable contract between Awad and Middesk, and which is attached hereto as **Exhibit B**.

122.    Awad's Agreement provides that Awad will: 1) only use confidential and proprietary information for the Company's purposes; and 2) not engage in any conduct supporting a directly competitive business while employed by Middesk.

123.    Middesk's investigation to date has revealed that beginning in or around October 2022, and continuing until his termination in January 2023, Awad accessed confidential, proprietary, and trade secret information and emailed the documents to his personal email address.

124.    After his termination from Middesk, Awad started a direct competitor, Baselayer. Upon information and belief, Awad utilized the proprietary information for the purpose of engaging in behavior contrary to his confidentiality agreement and founding Baselayer.

125.    Upon information and belief, Awad is using this information or intends on using this information for the benefit of Baselayer.

126.    Awad's actions are in violation of the Awad Agreement.

127.    Middesk has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

27

## COUNT III
### Tortious Interference with Contractual Relations
**(Against the Defendants Awad, Hyde, and Baselayer)**

128.    The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

129.    Awad and Baselayer have tortiously interfered with Middesk's contractual relationship with Leviloff.

130.    Middesk has a valid and enforceable confidentiality agreement with Leviloff. Awad and Baselayer knew or should have known of Leviloff's confidentiality agreement with Middesk.

131.    Leviloff continues to be bound by his Agreement, which is an enforceable contract between Leviloff and Middesk.

132.    Awad executed an identical agreement with Middesk as a former employee of the Company.  As a result, Awad and Baselayer were aware of the specific confidentiality restrictions within the Agreement.

133.    Despite this knowledge, Awad directed Leviloff to obtain Middesk's confidential and proprietary information: (1) while still employed by Middesk; and (2) for the improper purpose of sharing the information he obtained with Awad and Baselayer.

134.    Leviloff followed Awad's direction, accessing dozens of files after Awad's directive, upon information and belief, and did in fact share this confidential information with Awad and Baselayer.

135.    Awad and Hyde also solicited confidential and trade secret information concerning Middesk's product performance from Leviloff, which Leviloff provided.

136.    Awad, Hyde, and Baselayer willfully and intentionally interfered with this agreement, without privilege to do so, by aiding, abetting, and assisting Leviloff in breaching his contractual obligations to Middesk, including, but not limited to, his obligations to not: (1) disclose

28

Middesk's confidential information; (2) improperly use Middesk's resources and data assets to aid a competitor in its unlawful and anti-competitive activities; and (3) use or disclose Middesk's confidential information for his own benefit or outside the scope of his employment with Middesk.

137.    Awad and Baselayer's misconduct was independently tortious and unlawful because it involved the conspiracy to hire Leviloff and have him work for Middesk and Awad and Baselayer at the same time, and involved the misappropriation of Middesk's confidential information. In addition, Awad and Baselayer intentionally induced Leviloff to breach his obligations under his confidentiality agreement in order to unfairly compete against Middesk and steal Middesk's existing clients and prospective clients.  Leviloff did in fact breach the Leviloff Agreement as a result of Awad and Baselayer's actions.

138.    Middesk has been damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

**COUNT IV**
**Defend Trade Secrets Act (18 U.S.C. § 1836(B))**
**(Against All Defendants)**

139.    The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

140.    Middesk has an advantage over its existing and would-be competitors based, in part, on the trade secret information it has developed and implemented in its business efforts.

141.    Middesk owns and possesses certain confidential, proprietary and trade secret information as alleged above.  Middesk has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets.

142.    Middesk possesses trade secrets in the form of, among other things, marketing materials, business plans, internal organizational materials, client information and potential client information, and pricing information.  They are sufficiently secret to derive economic value from not being generally known to persons who can obtain economic value from the disclosure or use

of the information.  This sensitive information was created and maintained through countless hours of direct client interactions and/or other work and would be otherwise unavailable to Defendants. The information is not known or available to the public, nor could the information be "reverse engineered" through public sources.

143.    Middesk's trade secrets relate to products sold and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

144.    Middesk's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets," under the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.*

145.    Middesk's former and current employees are under a duty to keep its trade secrets secret and not to use or disclose such information other than for the benefit of Middesk.  In taking Middesk's trade secrets from Middesk, Awad and Leviloff improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy for the benefit of Baselayer and themselves.

146.    Upon information and belief, Defendants have violated the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), by misappropriating trade secrets used in, or intended for use in, interstate or foreign commerce.

147.    Awad misappropriated Middesk's trade secrets by emailing confidential, proprietary information to his personal email address before his termination and without authorization before founding Baselayer, a direct competitor of Middesk.

148. Defendants misappropriated Middesk's trade secrets when Leviloff accessed computer files containing sensitive, proprietary information while still working for Middesk at the direction of Awad and for the benefit of Baselayer.

149. Awad and Baselayer induced the breach of duty by Leviloff to gain access to Middesk's trade secrets and use those secrets to advantage Baselayer's business. Defendants knew or at least had reason to know that they acquired and used the Middesk trade secrets by improper means.

150. Upon information and belief, Defendants have taken and retained Middesk's trade secrets in an unauthorized fashion and have misappropriated or will misappropriate Middesk's trade secrets.

151. Upon information and belief, Defendants have used and/or intend to use Middesk's trade secrets to their own benefit and to Middesk's detriment without the express or implied consent of Middesk.

152. Upon information and belief, as a direct result of Defendants' misappropriation of Middesk's trade secrets, Middesk has suffered and, if Defendants' conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law. Middesk has suffered and continues to suffer significant damages that will be proven at trial.

153. The DTSA specifically authorizes courts to award injunctive relief to prevent the actual or threatened misappropriation of trade secrets. Middesk seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Middesk's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

154. Middesk has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT V
## Breach of Fiduciary Duty
### (Against Defendant Leviloff and Awad)

155. The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

156. Leviloff, as an employee of the Company, owed a duty to, among other things, put the welfare and best interests of the Company above his own personal or other business interests.

157. Leviloff breached his fiduciary duties to the Company by engaging in the actions described herein while still employed by the Company, including accessing and sharing Middesk information with Awad, the CEO of a direct competitor Baselayer.

158. These actions constitute a breach of fiduciary duties to the Company.

159. Leviloff's conduct was intentional, willful, and outrageous, and was undertaken with reckless indifference to the rights of the Company.

160. Awad while employed and paid by Middesk was actively working to start a competitive company "Price Desk."

161. Using Middesk time and resources, he drafted plans, pitches, powerpoints, and fund raising plans for Price Desk.

162. Upon information and belief, his plans for Price Desk eventually became Baselayer, a direct competitor of Middesk.

163. Middesk has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT VI
## Aiding & Abetting Breach of Fiduciary Duty
### (Against Defendants Awad and Baselayer)

164. The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

32

165. As an employer of Middesk, Leviloff owed fiduciary duties to Middesk.

166. Awad and Baselayer knew or should have known that Leviloff owed Middesk fiduciary duties.

167. At all times alleged herein, Awad and Baselayer were aware of Leviloff's conduct as alleged above, including that Leviloff used his position at Middesk to steal confidential information to give to Awad and Baselayer at Awad's direction.

168. At all times alleged herein, Awad and Baselayer knew or should have known Leviloff's conduct constituted a breach of his fiduciary duties to Middesk.

169. Awad and Baselayer knowingly gave substantial encouragement and assistance to Leviloff so that he could accomplish the unlawful results alleged above.

170. Awad's and Baselayer's conduct in assisting these breaches of fiduciary duties was a substantial factor in causing the harm suffered by Middesk.

171. Awad and Baselayer knowingly and substantially participated, aided, and abetted the above-alleged breaches of the fiduciary duties committed by Leviloff.

172. Awad's and Baselayer's acts, omissions, and misconduct has caused continuous, connected, ongoing and material harm to Middesk.

173. Middesk has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## COUNT VII
### Unfair Competition
### (Against All Defendants)

174. The facts alleged in Paragraphs 1-112 are incorporated herein as if set forth in full.

175. Defendants' conduct, as described above, constitutes acts or practices that amount to an unfair method of competition and falls below the minimum standard of fair dealing.

33

176.    Defendants' conduct demonstrates a persistent effort to use the Company's confidential information and trade secrets to interfere with the Company's business, and unfairly compete with the Company in the marketplace.

177.    Defendants' conduct in attempting to interfere with the Company's business and usurp business opportunities of the Company hinders the efficient operation of the market.

178.    Defendants' conduct was intentional, willful, and outrageous, and was undertaken with indifference to the rights of the Company.

179.    Middesk has been damaged by all of the foregoing and is entitled to an award of injunctive relief, compensatory damages, exemplary damages, and attorneys' fees.

## JURY DEMAND

Plaintiff Middesk hereby requests and demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Middesk prays for an Order from this Court:

(a)    Declaring that Leviloff and Awad breached their Agreements with Middesk;

(b)    Declaring that Awad, Hyde and Baselayer have interfered with Middesk's contractual relations;

(c)    Declaring that Defendants have misappropriated Middesk's trade secrets;

(d)    Declaring that Defendants have no rights or privileges to use Middesk's trade secrets.

(e)    Awarding permanent injunctive relief pursuant to which Awad, Leviloff ,Hyde, and Defendants Baselayer, and all investors, employees, agents, officers, attorneys, successors, assigns, and all those acting on behalf of or in active consert or participation with any of them are ordered, enjoined, or retrained, directly, or indirectly, anywhere in the world, by any means whatsoever as follows:

34

i. from possessing, disclosing, and/or using Middesk's trade secrets;

ii. from making, testing, using, promoting, selling, offering to sell, marketing, commercializing, any product or service derived from Middesk's trade secrets.

iii. immediately to preserve from further altering, destroying, or disposing of any evidence, in any form, relating to this action, including, without limitation, physical documents, devices, emails, meta data, and electronic logs;

iv. immediately to catalog, quarantine, and return to Middesk: (a) all Middesk trade secrets; and (b) all copies of all documents, information, and materials, that are derived from, utilize, contain, embody, or were developed in whole or in part, with the benefit or use of any Middesk trade secrets;

v. to identify each individual and entity (including investors) to whom or to which Defendants disclosed (a) any Middesk trade secrets; (b) any documents, information or materials that were derived from, utilize, contain, embody, or were developed, in whole or in part with the benefit or use of Middesk trade secrets; and

vi. to turn over to the Court any proceeds Defendants received from the misappropriation of Middesk trade secrets, which proceeds will be held in constructive trust until the conclusion of this litigation.

(f)     Damages in an amount to be determined at trial including compensatory damages,

enhanced damages, exemplary damages, punitive damages, and up to the maximum amount permitted by law;

(g)    Pre-judgment and post-judgment interest at the rates prescribed by law;

(h)    Middesk's reasonable attorney fees and costs;

(i)    All other relief at law or in equity, if and to the extent supported by the evidence, to which Middesk may be entitled; and,

(j)    Such other and further relief as the Court may deem proper.

Dated:  May 19, 2025                              Respectfully submitted,


**_/s/ Justin K. Victor_**
Jason D. Burns
Shira M. Poliak
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9294
Jason.Burns@gtlaw.com
Shira.Poliak@gtlaw.com

Justin K. Victor (*phv*)
Fredric J. Bold, Jr. (*phv*)
Rushton Pope (*phv*
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
(678) 553-2100
Victorj@gtlaw.com
Rick.Bold@gtlaw.com
Rushton.Pope@gtlaw.com


*Counsel for Plaintiff Middesk, Inc.*