# Exhibit A

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

This Integration and Reseller Agreement, including the attached exhibit (collectively, the "**Agreement**"), is between Middesk, Inc. (**"Company"**) and Osiris Ratings, Inc. ("**Partner**") and sets forth the terms and conditions under which Company authorizes Partner to market and promote the Company Platform and Services, as defined herein. This Agreement is effective as of the Effective Date and includes: (1) the cover/signature page; (2) Exhibit A - Terms and Conditions for Distribution of the Integrated Solution and Services; (3) Exhibit B – Pricing List; and (3) Exhibit C – End User Terms. Exhibit A, Exhibit B, and Exhibit C are incorporated into and become a part of this Agreement. Capitalized terms not otherwise defined herein shall have the meaning set forth in Exhibit A.

---

**PARTNER INFORMATION:**

Partner Name: Osiris Ratings, Inc.

Partner Primary Contact Information:

Name: Jonathan Awad

Title: Co-Founder, CEO

Address:

Phone Number: 6463315160

Email: jonathan@osirisratings.com

---

The parties have caused their authorized representatives to execute this Agreement effective as of the date last signed below (the "**Effective Date**").

**MIDDESK, INC.**

By: _____ DocuSigned by: [signature] 154E3323E64B446...

Name: Kyle Mack

Title CEO

Date: 7/21/2023

**PARTNER**

By: _____ DocuSigned by: [signature] Jonathan Awad F035C27506AC401...

Name (print): Jonathan Awad

Title: Co-Founder, CEO

Date: 7/21/2023

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

**EXHIBIT A**

**TERMS AND CONDITIONS FOR DISTRIBUTION OF INTEGRATED SOLUTION AND SERVICES**

1.      **Definitions**. Capitalized terms in this Agreement shall have the following meanings:

"**API**" means the Company Platform's application programming interface(s) used to provide Company's services.

"**Business Report**" means the production of a corporate identity report.

"**Company Information**" means the information required to be submitted to the Company Platform to produce a Business Report on a corporate entity.

"**Company Platform**" means the corporate identity platform offered by Company, that allows access to Company's various products, including but not limited to the End User Portal, the APIs and other technology and tools offered by Company.

"**Customer Data**" means Company Information and any other proprietary information submitted to the Company Platform by Partner on behalf of an End User or Mutual Customer, including without limitation client lists.

"**Documentation**" means any technical literature, End User agreements or instructions, and other written materials ordinarily provided by Company with the Company Platform.

"**End User**" means a customer of Partner that purchases access to the Services (and Reports contained therein) from Partner.

"**End User Agreement**" means a separate written agreement between Partner and an End User governing the provision of the Services, as may be modified, amended, or supplemented from time-to-time in accordance with the terms thereof.

"**End User Portal**" means the online Company portal and related tools that Company makes available to End Users and its other customers, to access the Company Platform and manage Business Report(s).

"**Entity**" means an individual business for whom a Business Report is generated by the Company.

"**Integrated Solution**" means the integrated offering of the Services, with one or more other services, on the Partner Platform. The Integrated Solution includes the receipt and transmission of information, but does not include compiling, assembling, or evaluating business information and Partner has no authority to change the content of any Report received from Company.

"**Intellectual Property Rights**" means all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights that may exist now or later in any jurisdiction, including without limitation any applications and registrations for the foregoing.

"**Laws**" means all applicable laws, rules and regulations, whether federal, state or local.

"**Mutual Customer**" means a mutual customer of Company and Partner that purchases access to the Services (and Reports contained therein) directly from Company.

"**Partner Platform**" means Partner's platform, software-as-a-service, application programming interface and/or software interface, including without limitation, any other technology and tools offered by Partner.

"**Report**" means an applicable screening product offered on the Company Platform or by Partner through the Integrated Solution.

"**Services**" means Company's screening solutions, including the Reports, the service of obtaining, compiling assembling and otherwise preparing lawfully authorized Reports, and making those Reports available.

"**Territory**" means the geographic locations in which Partner may market and distribute the Services, namely anywhere in the United States of America.

2.      **Appointment of Partner; Scope of Appointment.**

        2.1.    **Appointment as Reseller.** Subject to the terms of this Agreement, Company hereby authorizes Partner to purchase the Services directly from Company and to market, resell and distribute the Services to End Users within the Territory solely (a) as incorporated into, or bundled with the Integrated Solution; and (b) for authorized users of the Integrated Solution who (i) reside and will use the Partner Platform within the Territory, have a permissible purpose under the law, and (ii) sign-up for the Services via Integrated Solution. Partner may distribute the Services to End Users only with all warranties, disclaimers, notices, and intact as provided by Company. Partner will take all steps reasonably requested by Company to inform its End Users of any applicable restrictions and limitations regarding the use of the Company Platform or Services.

        2.2.    **Scope of Appointment.** Partner must require all End Users to execute an End User Agreement containing terms substantially similar to those attached in Exhibit C.  Partner will, upon request, promptly provide Company with a copy of such fully executed End User Agreement and certify to Company that an authorized representative of End User has executed such End User Agreement. Partner will not, nor allow its employees, representatives, or agents to, make any commitments, representations, or warranties with respect to Company, or the performance of the Company Platform or Services, except as authorized in advance and in writing by Company or derived from and consistent in all respects with materials provided to Partner by Company.

3.      **License Grants; Restrictions.**

        3.1.    **Trademark License Grant.**

        **3.1.1.** During the Term and subject to the terms of this Agreement, Company hereby grants to Partner, without charge, a limited, revocable, non-exclusive, non-transferable right to use and display in the Territory the trademarks, service marks, and logos claimed by Company ("**Marks**") solely in connection with and solely to the extent reasonably necessary for the

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

purposes of this Agreement. Partner will market the Company Platform and Services only under the Marks. Partner will not remove or alter the Marks, copyright notices, or packaging found on the Company Platform, the Services, and Documentation. Partner will use the Marks in accordance with Company's brand and trademark guidelines as in effect from time to time and provided to Partner by Company. Use of the Marks does not create in Partner's favor any right, title or interest in the Marks or any continuing rights to market or distribute the Company Platform or Services. Partner shall not register or apply for registration of any of the Marks (or any similar trademarks, service marks or logos) for itself, Company or any other party. Partner agrees to cooperate with Company if Company seeks to proceed with any infringement action regarding such rights.

3.1.2. During the Term and subject to the terms of this Agreement, Partner hereby grants to Company, without charge, a limited, revocable, non-exclusive, non-transferable right to use and display in the Territory the trademarks, service marks, and logos claimed by Partner ("**Partner Marks**") for publicity purposes solely in connection with the purposes of this Agreement. Company will use the Partner Marks in accordance with Partner's brand and trademark guidelines as in effect from time to time and provided to Company by Partner. In addition, Company will furnish to Partner, in advance for review and approval, all promotional, advertising or other materials that refer to or display any Partner Marks. Use of the Partner Marks does not create in Company's favor any right, title or interest in the Partner Marks or any continuing rights to market the Partner Platform. Company shall not register or apply for registration of any of the Partner Marks (or any similar trademarks, service marks or logos) for itself, Partner or any other party. Company agrees to cooperate with Partner if Partner seeks to proceed with any infringement action regarding such rights.

3.2.    **Use Grant.** The Company Platform is licensed and not sold. Company hereby grants to Partner a limited, non-exclusive, non-transferable license to: (a) copy, display, or use the documentation that Company provides to Partner, and the Company Platform to (i) achieve interoperability between the Company Platform and Partner Platform for purposes of offering the Integrated Solution, and (ii) promote, market and distribute the Services and Integrated Solution to End Users and Mutual Customers; (b) pass through to End Users and Mutual Customers the ability to access and use the Company Platform and Services; and (c) display and transmit the output of the Services, including the Reports, to End Users and Mutual Customers through the Integrated Solution. Company does not transfer any right, title or interest in the Company Platform or related APIs to Partner, any End User, or any other party and nothing contained herein shall be construed to provide any rights to Company's intellectual property beyond the licenses described in Sections 3.1 and 3.2. Partner acknowledges that no title or ownership of the proprietary rights to the Company Platform or APIs is transferred by virtue of this Agreement and that as between Partner and Company, Company owns all right, title, interest, and Intellectual Property Rights, in and to the Company Platform, APIs and any software, technology, materials and information contained therein, whether currently existing or later developed. Partner will use its reasonable efforts to protect Company's Intellectual Property Rights pursuant to this Agreement and will promptly report to Company any infringement or other violation of such rights of which Partner becomes aware.  As between Partner and Company, Partner owns all right, title, and interest, including Intellectual Property Rights, in the Partner Platform, and any software, technology, materials and information contained therein, and nothing herein shall be construed to transfer title or ownership of any proprietary rights in the Partner Platform to Company.

3.3.    **Restrictions.** Partner understands that only End Users and Mutual Customers may use the Services, including the Reports, for the purpose of evaluating an Entity. Partner may not, nor may Partner allow any third party to (i) modify, translate, reverse engineer, decompile, disassemble, otherwise attempt to derive source code from, or create derivative works based on, the Company Platform or related APIs; (ii) make unauthorized copies of the Company Platform or APIs; (iii) distribute the Company Platform, APIs, and/or Documentation, except to an End User or Mutual Customer, without Company's prior written authorization; (iv) remove any proprietary notices, labels or Marks on or in any copy of the Company Platform or Documentation; (v) alter or remove any warranties, disclaimers, and Documentation provided with the Company Platform or Services; or (vi) use the Company Platform in any manner or for any purpose other than which the Services have been incorporated or for which the Company Platform has been delivered.

4.    **Pricing; Payments**

4.1.    **Forecasts.** On a quarterly basis, Partner will provide to Company a three-month forecast of Partner's expected sales of Services (by number of End Users and estimated net revenue). Company reserves the right to update the foregoing requirement and its other business reporting, policy and procedure requirements and format from time to time to meet its business needs.

4.2.    **Purchase Price & Taxes.** The purchase price for the Services and Reports that Partner shall pay to Company is the price set forth on Exhibit B ("**Pricing List**"). Partner will set the prices End Users pay for the Services and Reports, and such prices will be negotiated solely between Partner and the applicable End User. Unless otherwise expressly agreed to in writing by Company, all amounts payable under this Agreement are exclusive of applicable taxes. Partner shall pay all sales, use, VAT, property, ad valorem, income and similar taxes; all customs, duties, import fees, or similar charges; stamp duties, license fees, and similar costs; and all other mandatory payments to government agencies of whatever kind with respect to the sale of the Services ("**Taxes**"). Partner will make all payments required hereunder to Company free and clear of, and without reduction for, any Taxes, including withholding Taxes. Any Taxes imposed on any payments hereunder to Company will be Partner's sole responsibility, and Partner will, upon Company's request, provide Company with official receipts issued by the appropriate taxing authority and/or a tax exemption certificate acceptable to the taxing authorities. Partner shall promptly reimburse Company for any and all Taxes that Company pays or is required to pay in connection with this Agreement or Company's performance under this Agreement, other than Company's own income taxes. In addition, Partner shall indemnify, defend, and hold harmless Company and its officers, directors, agents, and employees from and against any and all claims, demands, actions, litigation, investigations, and proceedings ("Lawsuits") arising out of or related to Partner's obligation to pay such Taxes as set forth hereunder, unless such Lawsuits arise from the gross negligence or willful wrongdoing of Company.

4.3.    **Payments and Reporting**. At the end of each applicable month, Company will provide Partner with a monthly invoice itemizing the purchases of Company Services and Reports made in that month. Partner will confirm the invoiced amount within fifteen

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

(15) business days of the invoice date. All payments will be made to Company within thirty (30) days of invoice date. Any undisputed amounts not paid when due will bear interest at a rate of 1.0% per month or the maximum rate permitted by law, whichever is less. In the event Partner disputes in good faith any open invoices, or any part thereof, it will notify Company of such dispute, and the reasons for such dispute, in writing within thirty (30) days of its receipt of an invoice. The parties will work together in good faith to promptly resolve any such disputed invoice, such good faith to include the provision to Partner of relevant information reasonably requested by Partner regarding the billing reconciliation report, within thirty (30) days from providing notice of the dispute.

5. **Company and Partner Requirements; Integrated Solution**

5.1. **Integration Plans and Specifications**. Partner will integrate with the Company's Services to provide the Integrated Solution. Partner shall use best commercial efforts to complete the Integrated Solution within ninety (90) days from the Effective Date of this Agreement.

5.2. **Support to End Users**. Partner shall be responsible for providing first tier support to its End Users. Company shall provide second tier support and will make commercially reasonable efforts to respond to inquiries related to the Company Platform or Services from both Partner's employees and End Users between 8:00 am to 5:00 pm Pacific time, Monday through Friday, except on United States bank holidays. End User support inquiries should be emailed to support@middesk.com.

5.3. **Security**. Company will: (a) implement such reasonable physical, organizational and technological safeguards as are appropriate to the sensitivity of the Customer Data to protect the confidentiality, security and integrity of the Customer Data, in accordance with best industry standards; (b) restrict access to the Customer Data to only those individuals who require such access to perform their duties or services, and provide appropriate training to such individuals respecting handling Customer Data in accordance with applicable Laws and this Agreement; (c) promptly advise Partner of any and all third-party inquiries, complaints, access requests, and other third-party communications regarding Customer Data, and co-operate with Partner and each End User to provide individuals with timely access to their own Customer Data; (d) cooperate with Partner and each End User to amend, rectify, delete or update Customer Data in accordance with written instructions from the End User within ten (10) days of receiving such written instructions; (e) notify the Partner promptly, in writing, of any material breach of this paragraph, including but not limited to any unauthorized access, use, or disclosure of Customer Data, and co-operate with Partner and the End User to remedy any security breach or other breach of this paragraph, and meet any requirements prescribed by law in respect of such breach; and (g) promptly notify Partner of any changes to its policies, procedures or protocols respecting the collection, use, storage, processing and destruction of Customer Data.

6. **Warranties; Disclaimer.**

6.1. Each Party hereby represents and warrants that: (a) it is duly formed, validly existing, and in good standing under the laws of its state of incorporation or formation; (b) it has the right, power and authority to enter into this Agreement; (c) this Agreement has been duly and validly executed and delivered and constitutes legal, valid and binding obligations; (d) it shall comply at all times with all applicable laws, rules and regulations in connection with carrying out its obligations contained herein, including the federal Fair Credit Reporting Act, 15 USC §§ 1681 et seq. and any equivalent state laws, as they may be amended from time to time; (e) there is no pending or, to its knowledge, threatened civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigations against or relating to it or any of its subsidiaries; and (f) neither the execution, delivery or performance of this Agreement nor the consummation of the transaction contemplated hereby shall conflict with, result in a violation or breach of, or require the consent of any person under the terms, conditions or provisions of any contract, notice, indenture, license, permit, lease or any other instrument.

6.2. PARTNER ACKNOWLEDGES THAT COMPANY OBTAINS THE INFORMATION IN ITS REPORTS FROM THIRD PARTY SOURCES "AS IS", AND THEREFORE PROVIDES THE INFORMATION TO PARTNER AND END USERS AND MUTUAL CUSTOMERS ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING FROM THE COURSE OF DEALING OR A COURSE OF PERFORMANCE WITH RESPECT TO THE ACCURACY, VALIDITY, OR COMPLETENESS OF ANY REPORTS THAT THE REPORTS WILL MEET PARTNER'S OR END USERS' OR MUTUAL CUSTOMER'S NEEDS, OR WILL BE PROVIDED ON AN UNINTERRUPTED BASIS; COMPANY EXPRESSLY DISCLAIMS ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, COMPANY EXPRESSLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR PERFORMANCE. COMPANY AND ITS SUPPLIERS, LICENSORS, PARTNERS, AND SERVICE PROVIDERS DO NOT WARRANT THAT THE FUNCTIONALITY AND INFORMATION PROVIDED BY THE PLATFORM WILL BE CORRECT, UNINTERRUPTED OR ERROR-FREE OR THAT DEFECTS WILL BE CORRECTED.

7. **Indemnification**.

7.1. **Partner Obligations**. Partner shall defend and indemnify Company, and its directors, officers and employees from and against any third party liabilities, damages, losses, judgments, costs, expenses (including reasonable attorneys' fees), claims, actions, demands and suits (collectively "**Claims**") arising out of or relating to: (a) an allegation that the Partner Platform infringes any third-party patent or copyright of the United States ("**Partner IP Claims**"); and (b) Partner's violation of any applicable law related to its performance under this Agreement, including, without limitation, the wrongful or unauthorized access to any Entity data not required for the purposes of the current integration under this Agreement. Partner has no obligation to indemnify Company for a Partner IP Claim to the extent that it resulted (i) from Company's modification of the Partner Platform if such Partner IP Claim would have been avoided in the absence of such modification; (ii) due to the combination of the Partner Platform with any other materials that were not contemplated for the purposes of this Agreement if such Partner IP Claim would have been avoided in the absence of such combination; or (iii) Company's use of the Partner Platform in a manner not authorized by Partner. Should the Partner Platform become, or in Partner's opinion likely become the subject of a Partner IP Claim, Partner, at its option, may either: (a) procure for Company the right to continue using the Partner Platform, (b) modify Partner Platform to make it non-infringing provided the same functionality is maintained, or (c) terminate this Agreement as to

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

the potentially infringing services. THE INFRINGEMENT INDEMNITY SET FORTH IN THIS SECTION 7.1 STATES PARTNER'S ENTIRE LIABILITY AND OBLIGATION AND COMPANY'S SOLE REMEDY FOR ANY CLAIM OF INFRINGEMENT OF THIRD PARTY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS.

**7.2.** **Company Obligations** Company agrees to defend and indemnify Partner, and its directors, officers, employees and End Users from and against Claims arising out of or relating to: (a) an allegation that the Company API, Reports, Company Platform or Company Services and products contained therein ("Company Materials"), infringe any third-party patent or copyright of the United States ("**Company IP Claims**"); (b) Company's breach of its obligations under Paragraph 5.3; and (c) to the extent Partner or End User utilizes Company's Hosted Platform, Company's failure to comply with its obligations under Law to Entities. Company has no obligation to indemnify Partner or End User for a Company IP Claim under 7.2(a) to the extent that it resulted (i) from Partner's or End User's modification of the Company Materials if such Company IP Claim would have been avoided in the absence of such modification; (ii) due to the combination of the Company Materials with any other materials that have not been approved by Company if such Company IP Claim would have been avoided in the absence of such combination; (iii) Partner or End User's use of the Company Materials in a manner not authorized by Company, or not in compliance with the Documentation; or (iv) Partner's failure to promptly update the Company API with a new production version provided by Company or Partner or End User's continued allegedly infringing activity after being notified thereof or of modifications that would have avoided the alleged infringement. Should the Company Materials become, or in Company's opinion likely become the subject of a Company IP Claim, Company, at its option, may either: (a) procure for Partner the right to continue using the Company Materials, (b) modify the Company Materials to make it non-infringing provided the same functionality is maintained, or (c) terminate this Agreement as to the potentially infringing services and provide a refund of any prepaid, unused fees for the Company Materials. THE INFRINGEMENT INDEMNITY SET FORTH IN THIS SECTION 7.2 STATES COMPANY'S ENTIRE LIABILITY AND OBLIGATION AND PARTNER'S SOLE REMEDY FOR ANY CLAIM OF INFRINGEMENT OF THIRD PARTY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS.

**7.3.** **Procedure.** Each indemnifying party's obligations are conditioned upon such indemnifying party receiving: (i) prompt notice from the indemnified party of any Claim; (ii) sole control of the defense and settlement of such Claim; and (iii) reasonable assistance from the indemnified party (at indemnifying party's expense) in the defense and settlement of such Claim. The indemnifying party may not consent to the entry of judgment, admit any liability, or settle, compromise, or discharge the Claim, without the indemnified party's prior written consent.

**8.** **General Terms and Conditions.** These terms and conditions are applicable to this Agreement and all attachments:

**8.1.** **Confidential Information**. Each party will keep confidential all information and materials provided or made available, directly or indirectly, by the other party that is marked as confidential or proprietary, or is identified as confidential or proprietary at the time of disclosure, or the nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential, including but not limited to, Company Information, Customer Data, or other Entity data (collectively, "**Confidential Information**"). Company's Confidential Information includes but is not limited to, the features, functionality and content of the Platform and any planned modifications or updates thereto, Fees and pricing information. Each party will maintain all Confidential Information in strict confidence by using at least the same level of care that is uses for its own confidential information, but in no case less than a prudent and reasonable standard of care. Each party may use Confidential Information solely for the purposes of performing its obligations or exercising its rights hereunder. Information that either party can establish: (a) was lawfully in a party's possession before receipt from the other party; or (b) is or becomes a matter of public knowledge through no fault of the receiving party; (c) was independently developed or discovered by a party without the benefit of any Confidential Information of the other party; or (d) was obtained from a third party who is lawfully in possession of the Confidential Information and not, to the receiving party's knowledge, bound by confidentiality obligations to the disclosing party, shall not be considered Confidential Information under this Agreement. Each party may disclose Confidential Information solely to its employees and representatives that have a need to know to accomplish the purposes of this Agreement and each of whom are bound to protect the Confidential Information from unauthorized use and disclosure under the terms of a written agreement with terms as protective of the Confidential Information as those set forth in this Agreement. Each party may also disclose Confidential Information in response to a valid order of a court or other governmental body or as otherwise required by law to be disclosed; provided that, the responding party gives sufficient notice to the disclosing party to enable the disclosing party to take protective measures, and/or in any event only disclose the exact Confidential Information, or portion thereof, specifically requested. Except as otherwise expressly set forth in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party under this Agreement, whether express, implied or otherwise, to the other party. The obligations imposed on a receiving party shall survive until such time as the Confidential Information of the disclosing party becomes publicly available and/or made generally known through no action of the receiving party. All Confidential Information will be returned immediately to the disclosing party, or destroyed, after the receiving party's need for it has expired or upon request of the disclosing party or termination of this Agreement. Each party agrees that any violation of these confidentiality provisions will cause irreparable injury to the other party entitling the other party to injunctive relief or other equitable relief, in addition to, and not in lieu of, any other remedies such party may be entitled to. The disclosure of Confidential Information will be governed by this Agreement, which supersedes any previous confidentiality or nondisclosure agreement executed by or on behalf of the parties. Any such Confidential Information will be treated as if it were disclosed under this Agreement (and this Agreement were in effect) as of the date of such exchange.

**8.2.** **Compliance With Laws and Partner's Representations.** To the extent applicable to the Partner's Integrated Solution and an End User's use of the Services, including any Reports, Partner acknowledges that Partner may be subject to certain obligations under applicable Laws. Partner shall be responsible for complying with any applicable Laws. Company does not, and cannot, provide legal advice or other compliance related services to Partner or guarantee Partner's compliance with Laws in Partner's use of the Company Platform or the Services. Partner understands that any documents, information, conversations, or communication with Company's representatives regarding searches, verifications or other services offered by Company are not to be considered a legal opinion regarding such use.  Partner agrees to consult with its own legal counsel (1) about the use of screening information, including but not limited to, the legality of using or relying on reported information.

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

**8.3.** **Term; Termination.**

**8.3.1.** **Term.** This Agreement is effective for one (1) year from the Effective Date ("**Initial Term**"), unless terminated earlier in accordance with this Section 8.3. After the Initial Term of this Agreement, this Agreement will automatically renew for additional and successive one-year terms (each a "**Renewal Term**"), until terminated in accordance with the terms herein. The Initial Term and any Renewal Term are collectively referred to under the Agreement as the "**Term.**"

**8.3.2.** **Termination for Cause.** A party may terminate this Agreement (i) upon written notice to the other party in the event that the other party commits a material breach of this Agreement and fails to cure such material breach within thirty (30) days after receipt of notice; or (ii) the other party becomes subject to any voluntary or involuntary bankruptcy, insolvency, reorganization, or liquidation proceeding, has a receiver appointed for it, makes an assignment for the benefit of its creditors, or admits its inability to pay its debts as they become due.

**8.3.3.** **Termination without Cause.** Either party may terminate this Agreement without cause and without need for judicial or administrative action, award or resolution upon no less than 90 days' prior written notice. **Early Termination Fee.** If Partner terminates this Agreement for any reason prior to the end of the Initial Term other than for cause or if Company terminates this Agreement pursuant to 8.3.2, Partner will pay an early termination fee in an amount equal to any remaining minimums in the Term multiplied by the number of months remaining in the Term as of the effective date of such termination (including any partial month, which will count as a full month). The parties agree that the early termination fee set forth in Section 8.3.3 is a reasonable and genuine estimate of certain damages Company would suffer in the event of early termination (although not including damages covered by the Company's indemnification and other express recovery rights hereunder) and does not constitute a penalty.

**8.3.4.** **Obligations Upon Termination.** Upon termination of this Agreement:

(a) All authorizations and licenses granted by Company will immediately terminate and all rights shall revert to Company.

(b) Following any termination or expiration of this Agreement, the parties will meet for the purposes of creating a mutually agreed upon transition for existing End Users to a new provider (the "**Transition Period**"). During the Transition Period, Company will allow existing End Users to continue use of the Services through the Integrated Solution. Partner shall continue to pay the applicable fees for any End Users who use the Services through the end of the Transition Period.

(c) Each party will immediately return to the other party, or certify destruction of, all of the other's Confidential Information, provided each party may retain records to the extent necessary to comply with applicable law. Company's name, logo and any other proprietary information related to Company, or the Company Platform and Services will be removed immediately from the Partner Platform, Partner's website, e-mail signature, marketing and promotional materials, offices, and demonstration labs.

(d) Neither party will be liable to the other party for any claims, expenses, losses or damages of any kind, including, but not limited to, compensation or reimbursement for the loss of prospective profits, anticipated sales, or goodwill, arising out of termination of this Agreement in accordance with Sections 8.3.1, 8.3.2 or 8.3.3, regardless of whether such party is aware of any such claim, expense, loss or damage. However, termination will not extinguish any liability of either party arising before termination of this Agreement, including, without limitation, for payments due.

**8.4.** **Survival.** No termination of this Agreement will release either party from any payment or other obligation owed to the other, or affect any rights or liabilities of either party with respect to any breach of this Agreement. Sections 1, 2.2, 3.3, 4.2, 6, 7, and 8 shall survive termination of this Agreement until the obligations of those sections are completed.

**8.5.** **Severability.** If any part of this Agreement is found to be unenforceable, the remainder shall continue in full force and effect and the unenforceable provision shall be reformed so as to give maximum legal effect to the intentions of the parties as expressed herein.

**8.6.** **Waiver.** The failure of any party to enforce any of the terms and conditions of the Agreement shall not constitute a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

**8.7.** **Governing Law and Venue.** This Agreement is governed by California Law, excluding its choice of law rules. Each party submits to the personal and exclusive jurisdiction of the state and federal courts in San Francisco, California.

**8.8.** **Assignment.** Partner may not assign, sub-contract and/or delegate its rights and obligations under this Agreement without the prior written consent of Company. Subject to the foregoing, this Agreement inures to the benefit of and is binding on the parties' permitted assignees, transferees and successors. Any assignment, sub-contract and/or delegation in violation of the foregoing is void.

**8.9.** **Notices.** All notices ("**Notices**") shall be in writing and delivered by personal delivery, by certified or registered mail, return receipt requested or by a recognized overnight delivery service. Any such Notices shall be considered given upon receipt, as confirmed by the delivery confirmation record. All Notices shall be sent to the respective address, as set forth below, or to such other address as may be specified by either party to the other in writing in accordance with this Section.

| If to Company: | If to Partner: |
|---|---|
|  |  |

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

| | |
|---|---|
| Middesk, Inc.<br>85 2nd Street, Suite 710<br>San Francisco, CA 94105 | Partner Name: Osiris Ratings, Inc.<br>Partner Address: 445 Grand Street, Brooklyn, NY, 11211<br>Attention: Jonathan Awad<br>Telephone: 646-331-5160 |

**8.10.    Force Majeure.** Neither party will be responsible for any failure or delay in performance due, in whole or in part, directly or indirectly, to any contingency, delay, failure, or cause of any nature beyond its reasonable control, including, without in any way limiting the generality of the foregoing, fire, terrorism, epidemic, earthquake, storm, flood or other weather, unavailability of necessary utilities or raw materials, strike, lockout, unavailability of components, war, riot, acts of God, regulation, ordinance, or instructions of government or other public authorities, or judgment or decree of a court of competent jurisdiction (not arising out of breach by such party of this Agreement) or other event that is traditionally recognized by California courts as an event of force majeure. In the event of the happening of such a cause, the party whose performance is so affected will give prompt, written notice to the other party, stating the period of time the same is expected to continue. Such delay will not be excused under this section for more than one hundred eighty (180) days.

**8.11.    Independent Contractors.** The relationship established by this Agreement is that of independent contractors and nothing contained in this Agreement shall be construed to: (i) give either party the power to direct and control the business activities of the other, (ii) constitute the parties as partners, joint venturers, agents, franchisor/franchisee or otherwise as participants in a joint or common undertaking, or (iii) allow either party to create or assume any obligation on behalf of the other party.

**8.12.    LIMITATIONS OF LIABILITY. EXCEPT FOR DAMAGES ARISING FROM EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS OR FOR LIABILITIES ARISING PURSUANT TO EITHER PARTY'S INDEMNIFICATION OBLIGATIONS, NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL, RELIANCE, INCIDENTAL, CONSEQUENTIAL OR SIMILAR DAMAGES (INCLUDING LOSS OF REVENUE OR PROFITS) ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING THE USE OR INABILITY TO USE THE SERVICE, OR FOR ANY CONTENT OBTAINED FROM OR THROUGH THE SERVICE, ANY INTERRUPTION, INACCURACY OR ERROR IN THE CONTENT, EVEN IF SUCH PARTY HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**EXCEPT FOR DAMAGES ARISING FROM EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS OR FOR LIABILITIES ARISING PURSUANT TO EITHER PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY AND DAMAGES ARISING OUT OF THIS AGREEMENT EXCEED THE AMOUNTS COMPANY IS ACTUALLY PAID DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE OF THE CLAIM. RECOVERY OF THIS AMOUNT IS PARTNER'S SOLE AND EXCLUSIVE REMEDY HEREUNDER AND THE PARTIES AGREE THAT THE LIMITATIONS AND DISCLAIMERS OF LIABILITY SET FORTH IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE AND REGARDLESS OF THE THEORY OF LIABILITY. THE PARTIES AGREE THAT THE LIMITATIONS AND DISCLAIMERS OF LIABILITY UNDER THIS SECTION CONSTITUTE A FUNDAMENTAL BASIS OF THEIR BARGAIN.**

**8.13.    Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be an original instrument, but all of which shall constitute one and the same agreement.

**8.14.    Feedback. The parties are** not required to provide any ideas, feedback or suggestions regarding any of Company or Partner's products or services ("**Feedback**") to each other. In the event a party does provide any Feedback to the other party, such party agrees to assign all right, title and interest in and to such Feedback to the other party and agrees that the other party may freely use and exploit such Feedback without compensation to party.

**8.15.    Complete Agreement.** This Agreement, including the Exhibits, constitutes the entire understanding and contract between the parties and supersedes all prior agreements (including any prior Partner agreement entered into between the parties), commitments or representations, oral or written. The terms and conditions of this Agreement will further supersede all pre-printed terms and conditions contained on any purchase order or other business form submitted by Partner to Company from the Effective Date forward. This Agreement may not be amended or modified except by a writing executed by the duly authorized representatives of both parties.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT
**Packages & Pricing**

**OVERVIEW**

Middesk provides a dashboard and API to help companies manage data and workflows surrounding compliance, fraud, and underwriting risk. We aggregate data from public and web sources, report that information in a structured and logical format, and provide workflow tools to allow for simple operational reviews.

**PRODUCTS OFFERED**

**IDENTITY:** A comprehensive verification product that leverages government data, web presence, address information, and government sanctions lists to provide a complete perspective on an application. Identity allows clients to have complete confidence in each verification, allowing a business verification program to scale while minimizing risk and operational overhead.

| Each Identity report includes the following searches | |
| --- | --- |
| Secretary of State Records | Middesk will search for known entities in all 50 states. Based on the findings of the state registration searches, Middesk can return a variety of pieces of information surrounding entity names, officers, addresses, dates, and status. |
| Address Analysis | Determine key pieces of information about all submitted and developed addresses, such as the address type (commercial vs. residential), the deliverability of the address, and a number of other signals about an address that could indicate fraud or credit risk. |
| Web Presence | Middesk will flag common social profiles such as Facebook, making it easy to complete any additional review, as well as provide a detailed overview of the legitimacy of the entities' website. |
| OFAC Watchlist | By searching the consolidated OFAC sanctions list, Middesk will determine if any submitted or developed entity names appear on the OFAC sanctions watchlist. More than ten watchlists are included today. |
| Domain Records | Determine domain status, understand creation date and any major site transfers automatically. |
| TIN Verification | Verify that a business's Employer Identification Number exists and belongs to a given business. Middesk will search for the Tax ID against the IRS TIN Matching program. |
| True Industry | Based on the website provided, Middesk will determine if the entity belongs in any high-risk or prohibited industries. If the business appears in any high-risk industries, Middesk will flag this business for further review. |
| **Each Identity report includes the following services** | |
| Middesk Quality Assurance | Our team of professionals will support the review of reports ensuring that the reports we return are up-to-date, complete, and accurate. |

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

| | |
|---|---|
| Compliance Tracking | Middesk stores date and timestamps of all report actions. Effortlessly understand who has been involved in the order, review, and decision of each business that you've engaged with. |
| Business Rules | Simple business rules flag the most important information you need to understand to automate workflows and make quick decisions on where and how to investigate entities. |

**LIEN SEARCH:** Lien Search is for lenders who need fast, accurate, quality liens data for smart decision-making on customers. Lien Search provides direct connections to government portals.

| Each Lien Search includes the following | |
|---|---|
| Lien Search | The lien search product returns details from the UCC1 data for liens on an associate registered entity, including: the debtor, secured party, filing date, lapse date, file number, and status. |

| Additional Data Services | |
|---|---|
| Bankruptcy Search and Monitoring | Monitoring of all district bankruptcy courts. Middesk will provide proactive alerts for any businesses or individuals that file for bankruptcy. |
| Sanctions Monitoring | Monitoring of standard global sanctions lists. Middesk will provide proactive alerts for any businesses that are identified on global sanctions lists. |
| SOS Monitoring | Monitoring for any Secretary of State changes. Middesk will provide alerts for any changes made to a business's Secretary of State records (business name, address, registration status, officer, etc.) |
| Corporate Documents | Middesk will leverage state-level repositories to source and provide formation documents for businesses. Middesk can return Articles of Incorporation (for corporations), Articles of Organization (for LLCs), and Certificates of Good Standing |

**PRICING**

| Terms Overview | |
|---|---|
| Business Model | The primary model will be usage-based. Middesk will apply any volume-based discounts during each billing period based on usage. |
| Service Term | 1 - Year |
| Billing Frequency | Monthly |

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

| List Pricing (volume discounts below) |
| --- |
| Identity Report: $6.00 |
| TIN Verification (standalone): $1.50 |
| Lien Search:  $5.00 |
| Corporate Documents: $5.00 per business where documents are ordered (additional to Identity Report) |
| Sanctions Monitoring: $0.50/business/month |
| Bankruptcy Monitoring: $0.50/business/month |

**Reseller Unit Rates  (see Product Descriptions for definition of each product)**

| Monthly volume[1] | Discount from list price | Identity | Identity Lite |
| --- | --- | --- | --- |
| 1 to 1,000 units | 29.17% | $4.25 | $2.83 |
| 1,001-5,000 units | 33.33% | $4.00 | $2.67 |
| 5,001-15,000 units | 37.50% | $3.75 | $2.50 |
| 15,001+ units | 45.83% | $3.25 | $2.17 |

| Monthly volume[1] | Discount from list price | TIN Verification |
| --- | --- | --- |
| All | 40% | $0.90 |

[1]*Monthly volume on each product individually.  E.g. In a given month, usage is 1,001 units of Identity and 1 unit of TIN verification.  The first 1,000 units of Identity is priced at $4.25 per unit. The 1,001st unit of Identity is priced at $4.00 per unit.  The 1 unit of TIN verification is priced at $0.90 per unit.*

**Deal Registration**

For Financial Institutions with assets equal to or less than $30 billion, and for Fintechs with market capitalization or valuation equal to or with less than $5 billion, Partner is permitted to resell Middesk Services to End Users according to the terms of the Agreement. For Financial Institutions with more than $30 billion in assets, and for Fintechs with more than $5 billion in market capitalization or valuation, Partner is required to register such prospective End Users with Middesk prior to negotiating terms with such End Users for Middesk Services ("Deal Registration"). After End User registration, Middesk and Partner will work together to determine the appropriate path forward, be it referral, reseller, or any other approach,

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

given the circumstances of each End User situation. For the avoidance of doubt, Middesk reserves the right to require Partner to refer certain End Users to contract directly with Middesk as determined on a case by case basis.

In the event that a referred customer through Deal Registration or as otherwise referred by Partner contracts directly with Middesk for Middesk's services ("Qualifying Mutual Customer"), Middesk will pay Partner a 10% referral fee (the "Partner Referral Fee"). Middesk will pay Partner at the conclusion of each calendar quarter (i.e. March 31, June 30, September 30 and December 31), the sum of all Partner Referral Fees of all Qualifying Mutual Customers during that quarter.

**MIDDESK END USER ORDER FORM**

| | |
|---|---|
| End User Name: | End User Contact Name: |
| End User Address: | End User Contact Phone: |
| | End User Contact E-Mail: |

**Services**: Middesk provides a platform for End Users to verify and monitor various business credentials. Middesk assembles various records for the purpose of generating a Business Risk Report, which is provided to End User (the "Service(s)").

**Initial Service Term**: One Year

**Implementation Services**:  Middesk will use commercially reasonable efforts to provide Customer the services described in the Statement of Work ("SOW") attached as Exhibit A hereto ("Implementation Services"), and Customer shall pay Middesk the Implementation Fee in accordance with the terms herein.

**Implementation Fee (one-time)**:  $0.00

**Publicity:**  End User agrees to use of its logo for approved marketing content of Middesk.

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT
**Exhibit C to Integration and Reseller Agreement**

**MIDDESK TERMS AND CONDITIONS**

These terms and conditions ("Middesk Terms and Conditions") govern Customer's use of the Middesk, Inc. ("Middesk") screening solutions that Partner is reselling to Customer ("Middesk Services").

1.      **RESTRICTIONS AND RESPONSIBILITIES**

1.1      Customer will not, directly or indirectly: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Middesk Services or any software, documentation or data related to the Middesk Services ("Software"); modify, translate, or create derivative works based on the Middesk Services or any Software (except to the extent expressly permitted by Partner or authorized within the Middesk Services); use the Middesk Services or any Software for timesharing or service bureau purposes or otherwise for the benefit of a third party; or remove any proprietary notices or labels.

1.2      Further, Customer may not remove or export from the United States or allow the export or re-export of the Middesk Services, Software or anything related thereto, or any direct product thereof in violation of any restrictions, laws or regulations of the United States Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control, or any other United States or foreign agency or authority.  As defined in FAR section 2.101, the Software and documentation are "commercial items" and according to DFAR section 252.2277014(a)(1) and (5) are deemed to be "commercial computer software" and "commercial computer software documentation." Consistent with DFAR section 227.7202 and FAR section 12.212, any use modification, reproduction, release, performance, display, or disclosure of such commercial software or commercial software documentation by the U.S. Government will be governed solely by the terms of these Middesk Terms and Conditions and will be prohibited except to the extent expressly permitted by the terms of these Middesk Terms and Conditions.

1.3      Customer represents, covenants and warrants that Customer will use the Middesk Services only in compliance with this Agreement and, as applicable, Middesk's Terms of Service and Privacy Policy which can be found at www.middesk.com (collectively, the "Policies") and all applicable laws and regulations. Customer hereby agrees to indemnify and hold harmless Middesk against any damages, losses, liabilities, settlements, and expenses (including without limitation costs and attorneys' fees) in connection with any claim or action that arises from an alleged violation of the foregoing or otherwise from Customer's use of Middesk Services or Software. Although Middesk has no obligation to monitor Customer's use of the Middesk Services, Middesk may do so and may prohibit any use of the Middesk Services it believes may be (or alleged to be) in violation of the foregoing.

1.4      Customer shall be responsible for obtaining and maintaining any equipment and ancillary services needed to connect to, access or otherwise use the Middesk Services, (including through Partner) including, without limitation, modems, hardware, servers, software, operating systems, networking, web servers and the like (collectively, "Equipment").  Customer shall also be responsible for maintaining the security of the Equipment, Customer account, passwords (including but not limited to administrative and user passwords) and files, and for all uses of Customer account or the Equipment with or without Customer's knowledge or consent.

2.      **CONFIDENTIALITY; PROPRIETARY RIGHTS**

2.1      Proprietary Information of Middesk includes non-public information regarding features, functionality and performance of the Service.  Customer agrees: (i) to take reasonable strict precautions to protect such Proprietary Information, and (ii) not to use (except for its own internal business purposes) or divulge to any third person any such Proprietary Information. Customer may disclose Proprietary Information in response to a valid order of a court or other governmental body or as otherwise required by law to be disclosed; provided that, Customer gives Middesk sufficient notice to enable the Middesk to take protective measures, and/or in any event only discloses the exact Proprietary Information, or portion thereof, specifically requested.

2.2      Middesk shall own and retain all right, title and interest in and to (a) the Middesk Services and Software, all improvements, enhancements or modifications thereto, and (b) all intellectual property rights related to any of the foregoing.

2.3      Notwithstanding anything to the contrary, Middesk shall have the right to collect and analyze data and other information

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

relating to the provision, use and performance of various aspects of the Middesk Services and related systems and technologies (including, without limitation, search input data, information concerning Customer's use of the Services, and data derived therefrom), and Middesk will be free (during and after the term hereof) to (i) use such information and data to improve and enhance the Middesk Services and for other development, diagnostic and corrective purposes in connection with the Middesk Services and other Middesk offerings, and (ii) disclose such data solely in aggregate or other de-identified form in connection with its business. No rights or licenses are granted except as expressly set forth herein.

### 3. WARRANTY AND DISCLAIMER

Middesk Services may be temporarily unavailable for scheduled maintenance or for unscheduled emergency maintenance, either by Middesk or by third-party providers, or because of other causes beyond Middesk's reasonable control.  MIDDESK DOES NOT WARRANT THAT THE MIDDESK SERVICES OR SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE MIDDESK SERVICES OR SOFTWARE.  EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, THE MIDDESK SERVICES AND SOFTWARE ARE PROVIDED "AS IS" AND MIDDESK DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

### 4. LIMITATION OF LIABILITY

IN NO EVENT WILL MIDDESK'S AGGREGATE LIABILITY AND DAMAGES ARISING OUT OF THIS AGREEMENT EXCEED THE AMOUNTS CUSTOMER ACTUALLY PAID TO MIDDESK (THROUGH PARTNER) DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE OF THE CLAIM. THE LIMITATIONS AND DISCLAIMERS OF LIABILITY SET FORTH IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE AND REGARDLESS OF THE THEORY OF LIABILITY.

NOTWITHSTANDING ANYTHING TO THE CONTRARY, EXCEPT FOR BODILY INJURY OF A PERSON, MIDDESK AND ITS SUPPLIERS (INCLUDING BUT NOT LIMITED TO ALL EQUIPMENT AND TECHNOLOGY SUPPLIERS), OFFICERS, AFFILIATES, REPRESENTATIVES, CONTRACTORS AND EMPLOYEES SHALL NOT BE RESPONSIBLE OR LIABLE TO CUSTOMER WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED THERETO UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY: (A) FOR ERROR OR INTERRUPTION OF USE OR FOR LOSS OR INACCURACY OR CORRUPTION OF DATA OR INFORMATION OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY OR LOSS OF BUSINESS; (B) FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, PUNITIVE, RELIANCE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES; (C) FOR ANY MATTER BEYOND MIDDESK'S REASONABLE CONTROL; OR (D) FOR ANY AMOUNTS THAT, TOGETHER WITH AMOUNTS ASSOCIATED WITH ALL OTHER CLAIMS, EXCEED THE FEES PAID BY CUSTOMER TO Partner FOR THE MIDDESK SERVICES IN THE 12 MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY, IN EACH CASE, WHETHER OR NOT MIDDESK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### 5. THIRD PARTY BENEFICIARIES

Middesk is a third party beneficiary of this Agreement as it relates to these Middesk Terms and Conditions.

### 6. MISCELLANEOUS

If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable.  These Middesk Terms and Conditions are not assignable, transferable or sublicensable by Customer except with Middesk's prior written consent.  Middesk may transfer and assign any of its rights and obligations under these Terms and Conditions without Customer's consent.  This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement. No agency, partnership, joint venture, or employment is created as a result of this Agreement and Customer does not have any authority of any kind to bind Middesk in any respect whatsoever.  In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees.  All notices under this Agreement will be in writing and will be deemed to have been duly given when received, if

DocuSign Envelope ID: 99EB358A-797B-460A-9901-2747C38B6A07

MIDDESK, INC.
INTEGRATION & RESELLER AGREEMENT

personally delivered; when receipt is electronically confirmed, if transmitted by facsimile or e-mail; the day after it is sent, if sent for next day delivery by recognized overnight delivery service; and upon receipt, if sent by certified or registered mail, return receipt requested. This Agreement shall be governed by the laws of the State of New York without regard to its conflict of laws provisions.

DOCS/3004049.2
DOCS/3004049.3